*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0040P (6th Cir.)
File Name: 01a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| 99-6370<br>H. CARL MCCALL, as Comptroller of the State of New York and Trustee of the New York State Common Retirement Fund, derivatively on behalf of Columbia/HCA Healthcare Corporation; CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM; NEW YORK STATE TEACHERS' RETIREMENT SYSTEM; NEW YORK CITY FIRE DEPARTMENT PENSION FUND; NEW YORK CITY POLICE DEPARTMENT PENSION FUND; NEW YORK CITY TEACHERS' RETIREMENT SYSTEM; NEW YORK CITY BOARD OF EDUCATION RETIREMENT SYSTEM; NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM; LOS ANGELES COUNTY EMPLOYEES' RETIREMENT ASSOCIATION; TEACHERS' | Nos. 99-6370/6387 |

1

We **AFFIRM** the dismissal of the duty of loyalty claim for failure to make a pre-suit demand; **REVERSE** the dismissal of the claim for intentional or reckless breach of the duty of care; and **REMAND** the case for further proceedings consistent with this opinion.

RETIREMENT SYSTEM OF LOUISIANA; CITY OF PHILADELPHIA, acting through its Board of Pensions and Retirement; CONCORD INVESTMENT COMPANY EMPLOYEES' 401(K) PROFIT AND SHARING PLAN AND TRUST; IRREVOCABLE TRUST FOR THE BENEFIT OF ROBERT MOORMAN, by its Trustee, Sidney J. Silver; NORMAN CHOCK, M.D.; NORMAN CHOCK, M.D., INC. PENSION AND PROFIT SHARING PLAN; NORMAN CHOCK, M.D., INC. INTEGRATED PROFIT SHARING PLAN, by Norman Chock, their Trustee/Owner; BARBARA E. SHUSTER; THE MAY FAMILY PARTNERSHIP; SAMUEL WEISS; MOISE KATZ; GRACE M. GISSELQUIST,
              *Plaintiffs-Appellants,*

NATIONAL INDUSTRY PENSION FUND,
              *Plaintiff,*

          *v.*

RICHARD L. SCOTT; THOMAS F. FRIST, JR., M.D.; R.

allegations concerning their relative holdings or the timing of the transfers.

Long is alleged to have sold 11,250 shares for about $490,000 since 1995, while he was a member of the Audit Committee. He was also a co-manager of The 1818 Fund, L.P., which purchased a $40 million Columbia note in 1991; held a warrant for 600,000 Columbia shares; and, since 1995, sold 781,762 Columbia shares for proceeds of $55.3 million. Other members of the Audit Committee, Reichardt, Averhoff, and MacNaughton, were not alleged to have engaged in insider trading. In fact, plaintiffs aver that MacNaughton, who owned over 550,000 shares, purchased 6,500 shares in January 1996.

Finally, McWhorter, who became a director in 1995 when Columbia acquired Healthtrust, sold over 1 million shares of Columbia stock for more than $38 million and contributed 135,400 shares, valued at $7 million, to charitable trusts since 1995. Even if the sheer magnitude of the number of shares sold by McWhorter could alone be enough to create a reasonable doubt as to his disinterestedness, it would not be sufficient to excuse the failure to make a pre-suit demand on the Board.

Although relying upon the "red flags" to allege that the directors knew or recklessly disregarded Columbia's improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to those warnings. Morever, not all of the "red flags" represent non-public materially adverse information. The federal search warrants executed in March 1997, the *New York Times* articles, and the *qui tam* lawsuit were not confidential matters. In fact, as previously mentioned, the *Thompson* lawsuit was disclosed by Columbia in its 10-K filing for the year ending December 1996. We find that plaintiffs' allegations are simply insufficient to state with particularity facts which create a substantial likelihood of liability on the part of at least a majority of the Board for breach of the duty of loyalty by insider trading.

CLAYTON MCWHORTER; T. MICHAEL LONG; WILLIAM T. YOUNG; FRANK S. ROYAL, M.D.; DONALD S. MACNAUGHTON; MAGDALENA AVERHOFF, M.D.; DAVID T. VANDEWATER; COLUMBIA/HCA HEALTHCARE CORPORATION, a nominal deft,

> *Defendants-Appellees.*

99-6387

LOUISIANA STATE EMPLOYEES RETIREMENT SYSTEM,

> *Plaintiff-Appellant,*

> *v.*

MAGDALENA AVERHOFF; JAY A. JARRELL; MICHAEL T. NEEB; ROBERT WHITESIDE; THOMAS F. FRIST; T. MICHAEL LONG, JR.; DONALD S. MACNAUGHTON; R. CLAYTON MCWHORTER; CARL E. REICHARDT; FRANK ROYAL; RICHARD L. SCOTT; DAVID VANDEWATER; WILLIAM T. YOUNG; JOHN DOE, and Richard Doe, being

fictitious, the parties intended being those officers, directors, agents and/or employees of the nominal defendant who participated in the wrongful acts involved herein; COLUMBIA/HCA HEALTHCARE CORPORATION, in whose behalf this action is being brought,

*Defendants-Appellees.*

Appeal from the United States District Court for the Middle District of Tennessee at Nashville. Nos. 97-00838; 98-00846—Thomas A. Higgins, District Judge.

Argued: December 7, 2000

Decided and Filed: February 13, 2001

Before: MARTIN, Chief Judge; GUY and COLE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Daniel L. Berger, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, New York, New York, I. Walton Bader, BADER & BADER, White Plains, New York, for Appellants. Paul H. Dawes, LATHAM & WATKINS, Menlo Park, California, for Appellees. **ON BRIEF:** Daniel L. Berger, Max W. Berger, Jeffrey N. Leibell, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, New York, New York, I. Walton Bader, BADER & BADER, White Plains,

expected to trade those securities in the normal course of events. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997). As a result, to recover insider profits for a breach of the duty of loyalty, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *Stepak*, 1985 WL 21137 at *5 (citing *Polin*, 552 F.2d at 811). Further, fraudulent intent may be inferred from the timing and quantities of the trades. *See Burlington*, 114 F.3d at 1424.

In this case, plaintiffs alleged in only a general way that between January 1995 and April 1997, Scott, Long, McWhorter, Young, and Reichardt breached their duty of loyalty by selling millions of dollars of Columbia stock to the public "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." Young and McWhorter are also alleged to have obtained substantial financial benefits, including income tax benefits, from making charitable contributions of stock valued at over $1 million and $7 million, respectively.

Plaintiffs aver that Scott owned more than 9.4 million shares or 1.4 percent of outstanding Columbia stock. Since 1995, Scott had sold only 128,000 shares valued at approximately $3.8 million. Frist owned over 14.5 million shares of Columbia stock, or 2.2 percent of the outstanding stock, which defendants claim is virtually as much as all of the plaintiffs combined. Since 1995, Frist is alleged to have disposed of only 298,052 shares of stock through gifts, and to have transferred about 2 million shares among trusts he controls. The substantial holdings that both Scott and Frist continued to maintain negate any inference that they were trading on materially adverse non-public information.

It is alleged that, during the two-year period, Royal sold 5,200 shares for about $216,250; while Young contributed 25,000 shares of Columbia stock, valued at the time at over $1 million, to charitable trusts. There were, however, no

Plaintiffs argue that the district court erroneously viewed this as a securities fraud claim and, consequently, improperly relied upon *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997). It is not clear that the district court cited *Sofamor* for anything more than the general proposition that the sale of stock by an insider is not inherently fraudulent. To the extent that the district court misread this claim, we nonetheless find that plaintiffs failed to allege particularized facts sufficient to create doubt as to the disinterestedness of a majority of the Board to consider a demand with respect to this claim.

The duty of loyalty requires that the best interests of the corporation and its shareholders take precedence over any self-interest of a director, officer, or controlling shareholder that is not shared by the stockholders generally. *See Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). Under Delaware common law, "'a fiduciary of a corporation who trades for his own benefit on the basis of confidential information acquired through his fiduciary position breaches his duty to the corporation and may be held accountable to that corporation for any gains without regard to whether the corporation suffered damages[.]'" *Polin v. Conductron Corp.*, 552 F.2d 797, 811 (8th Cir. 1977) (citation omitted) (discussing *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949)).[18]

As the district court observed, however, the mere fact that stocks were traded by an officer or director does not establish a breach of the duty of loyalty. *See Brophy*, 70 A.2d at 8. A director is free to trade in the corporation's stock without liability to the corporation. *See Tuckman v. Aerosonic Corp.*, C.A. No. 4094, 1982 WL 17810 (Del. Ch. May 20, 1982) (citing *Manacher v. Reynolds*, 165 A.2d 741 (Del. Ch. 1960)); *Brophy*, 70 A.2d at 8. In fact, when directors and officers own stock or receive compensation in stock, they should be

---

[18]It is undisputed that director liability would not be waived under the Restated Certificate of Incorporation as it expressly provides no protection from liability for breach of the duty of loyalty.

---

New York, for Appellants. William J. Meeske, LATHAM & WATKINS, Los Angeles, California, Steven A. Riley, BOWEN, RILEY, WARNOCK & JACOBSON, Nashville, Tennessee, David D. Aufhauser, Enu A. Mainigi, Dennis M. Black, WILLIAMS & CONNOLLY, Washington, D.C., James G. Thomas, NEAL & HARWELL, Nashville, Tennessee, John D. Kitch, KITCH & GARMAN, Nashville, Tennessee, William R. Willis, Jr., WILLIS & KNIGHT, Nashville, Tennessee, for Appellees.

---

## OPINION

---

RALPH B. GUY, JR., Circuit Judge. These appeals involve a consolidated stockholder derivative action brought on behalf of the nominal defendant, Columbia/HCA Healthcare Corporation (Columbia), against certain of its current and former directors and/or officers. The claims arise out of investigations into allegedly wide-spread and systematic health care fraud by Columbia's hospitals, home health agencies, and other facilities. Plaintiffs are investors, institutional and otherwise, that own shares of Columbia/HCA and owned such shares during the time of the alleged wrongdoing. Plaintiffs' three-count amended and consolidated complaint alleged intentional and negligent breach of the fiduciary duty of care, and intentional breach of the fiduciary duty of loyalty by illegal insider trading.[1] The

---

[1]The derivative shareholder claims were first brought, along with individual shareholder class claims, in *Morse v. McWhorter, et al.*, C.A. No. 97-0370, which was filed in the United States District Court for the Middle District of Tennessee on April 8, 1997. A number of other derivative shareholder actions were then filed. On August 26, 1997, the district court ordered that the derivative shareholder claims be consolidated and a single amended complaint be filed in the *McCall* case. The derivative action filed by plaintiff, Louisiana State Employees Retirement System (LSERS), in a Florida state court was removed to federal court, transferred to the Middle District of Tennessee, and administratively dismissed by stipulation as contemplated by the order

district court, adopting the findings and conclusions of the magistrate judge, dismissed the consolidated action under Fed. R. Civ. P. 12(b)(6), finding that plaintiffs had failed to sufficiently allege demand futility under Delaware law to excuse the failure to make a pre-suit demand on the Board of Directors. Plaintiffs argue that the district court failed to properly view the allegations in the light most favorable to them and made errors in the interpretation and application of the law.[2]

The director defendants, Thomas F. Frist, Jr., M.D.; R. Clayton McWhorter; Donald S. MacNaughton; Magdalena Averhoff, M.D.; Frank Royal, M.D.; T. Michael Long, Jr.; and William T. Young; filed a joint brief on appeal arguing that the dismissal was proper both for failure to allege demand futility and for failure to state a claim against them as directors. Defendants Richard Scott, who was Chairman of the Board and CEO of Columbia, and David Vandewater, who was the Chief Operating Officer (but not a director), each adopted the joint brief of the other individual defendants. Columbia likewise adopted the defendants' brief, but only as to the issue of demand futility. After careful review of the record and the applicable law, we reverse in part and find that

---

consolidating such claims in the *McCall* case. In that stipulation, LSERS agreed to be bound by the district court's decision on the motions to dismiss that were pending in *McCall* and reserved the right to appeal from that decision.

[2]These arguments, made in the *McCall* appeal, are adopted by LSERS only if it is does not prevail on its discrete claim that its complaint was improperly removed from state court. The only fair reading of the stipulation requires us to find that LSERS waived this claim by stipulating to be bound by the decision in *McCall.* Moreover, LSERS's challenge to the removal is without merit. Where there is complete diversity of citizenship, as LSERS concedes there was, the inclusion of an *unserved* resident defendant in the action does not defeat removal under 28 U.S.C. § 1441(b). *Wensil v. E.I. DuPont De Nemours and Co.*, 792 F. Supp. 447, 449 (D. S.C. 1992); *Republic Western Ins. Co. v. Int'l Ins. Co.*, 765 F. Supp. 628, 629 (N. D. Cal. 1991). *See also In re Norplant Contraceptive Prods. Liab. Litig.*, 889 F. Supp. 271, 274 (E.D. Tex. 1995).

---

Inaction by the Board will not excuse the failure to make a demand because it would deprive the Board of the opportunity to be "prodded" into action, which is a fundamental goal of the demand requirement. *See Stepak v. Ross*, C.A. No. 7047, 1985 WL 21137 (Del. Ch. Sept. 5, 1985); *Richardson v. Graves*, C.A. No. 6617, 1983 WL 21109 (Del. Ch. Mar. 7 1983).

Taking the allegations as a whole and drawing the reasonable inferences in plaintiffs' favor, we find that the particularized facts are sufficient to create a reasonable doubt as to the disinterestedness of at least five of Columbia's directors, including Scott, Frist, McWhorter, MacNaughton, and Averhoff, by alleging facts that presented a substantial likelihood of director liability for intentional or reckless breach of the duty of care.[17]

**E.   Duty of Loyalty**

Finally, plaintiffs alleged that certain of the directors breached the fiduciary duty of loyalty by engaging in insider trading while in possession of knowledge that Columbia was systematically violating federal and state laws. It is alleged that defendants sold and contributed stock between January 1995 and April 1997 with full knowledge that public disclosure of this materially adverse information would have adverse consequences for Columbia's stock price. The district court concluded that the particularized factual allegations of insider trading were not sufficient to support an inference of fraud and, therefore, did not pose a substantial risk of liability for any of the directors.

---

[17]Plaintiffs also alleged that there was a reasonable doubt as to the independence of Reichardt and Royal because they were beholden to Frist, who was responsible for their becoming Columbia directors. In addition to the business ties to Columbia that were mentioned earlier, Reichardt and Royal allegedly benefitted personally from their investments in the LBO of HCA in 1989 and the IPO of HCA in 1992. While we do not decide this question, we note that it is not enough to allege that a director was nominated or elected at the behest of another. *Aronson*, 473 A.2d at 816.

targeted on Medicare claim forms, and that Columbia's hospitals charged Medicare for the most expensive illnesses far more often than its nearby competitors. The *New York Times* announced that its "reporters had discussed their findings with Columbia officials for several months prior to the March raids." Without alleging who those officials might have been, plaintiffs' complaint stated that "the Board was aware in 1996 of the *New York Times'* investigation."

Rejecting the claim that the Board was aware of the investigation, the district court found it may have been reasonable for the Board to take more than two weeks to evaluate the *New York Times'* articles without taking any action. Plaintiffs ask that we assume that the reporter would have discussed the findings with either the directors themselves, or high-level executives who would have promptly alerted the Board. To do so would be speculation and not inference. At the same time, the higher-than-average CMIs and DRGs at Columbia's hospitals were not newly discovered as a result of the articles. Even if the Board was unaware of the *New York Times'* investigation before the articles were published, plaintiffs have alleged that the Board had already disregarded information suggesting wide-spread and systematic fraud may have been occurring in Columbia's facilities nationwide.

### 6. Board Inaction

On July 26, 1997, the Board of Directors accepted the resignations of both Scott and Vandewater. Those resignations were followed by the resignations of at least nine other senior executives.[16] Plaintiffs argue that the failure of the Board to remove Scott before July 26, 1997, demonstrates that a pre-suit demand in April 1997 would have been futile.

---

[16]Although plaintiffs allege that Columbia provided Scott and Vandewater with substantial severance packages, the district court correctly observed that the Board's decision in that regard is not relevant to the question of whether a demand would have been futile on April 8, 1997.

the plaintiffs sufficiently alleged demand futility with respect to their claim for intentional or reckless breach of the duty of care. Despite the urging of the individual defendants, we do not address the motions to dismiss the claims on the merits because they were not considered by the district court.

### I.[3]

Columbia/HCA is a Delaware corporation with its headquarters and principal place of business in Nashville, Tennessee. Founded in 1987 by Richard L. Scott, Columbia grew so aggressively that, by 1995, it owned and operated 45% of all for-profit hospitals in the United States. It was three times as large as the next largest for-profit health care management company and was the nation's ninth largest employer. Its strategy for growth was to acquire mid- to large-size general, acute-care hospitals. Plaintiffs alleged that Columbia operated 314 hospitals, 143 outpatient surgery centers, and over 500 home health care centers located in 35 states and 3 foreign countries. Columbia was Medicare's single largest provider and, between 1994 and 1996, received over 40% of its revenues from Medicare and Medicaid. Columbia participated in the Medicare, Medicaid, and CHAMPUS programs, with nearly all of its hospitals certified as providers of benefits under these programs.[4]

---

[3]Given the posture of this appeal, our summary of the facts is drawn from the plaintiffs' amended and consolidated complaint. Defendants also provided the district court with copies of the 10-K form filed with the SEC for the year ending December 1996; Columbia's Proxy Statement dated April 14, 1997, for the 1997 Annual Meeting, which was filed with the SEC and sent to shareholders; and Columbia's Restated Certificate of Incorporation. Despite having granted the motion to take judicial notice of these matters, the magistrate judge did not consider them. *See Bergstein v. Texas Int'l Co.*, 453 A.2d 467, 469 (Del. Ch. 1982). Although defendants do not challenge that determination, we take judicial notice of the Restated Certificate of Incorporation. *See In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995).

[4]CHAMPUS is a federally funded program administered by the Department of Defense for dependents of military personnel.

Plaintiffs alleged that Columbia's senior management, with Board knowledge, devised schemes to improperly increase revenue and profits, and perpetuated a management philosophy that provided strong incentives for employees to commit fraud. Plaintiffs averred that management set growth targets at 15 to 20%, or three to four times the industry average, which could not reasonably be attained without violating Medicare and Medicaid laws and regulations. Results were monitored using a "score card," and good results were rewarded with cash bonuses. Fraudulent practices allegedly included: (1) "upcoding" by providers, which refers to billing for services under DRG (diagnosis related group) codes for illnesses with a higher degree of complexity and severity than a patient's condition actually warranted; (2) improper cost reporting, such as seeking reimbursement for advertising and marketing costs, "grossing up" outpatient revenues, allocating costs from one division to another, and structuring transactions to disguise acquisition costs as reimbursable management fees; (3) offering financial incentives to physicians to increase referrals of Medicare patients to Columbia's facilities (*i.e.*, equity interests, fees, rents, or other perquisites); and (4) acquisition practices that offered inducements to executives of target companies and interfered with existing physician relationships. Plaintiffs also asserted that some of the defendants engaged in illegal insider trading since they traded while knowing of Columbia's fraudulent activities. Damages were alleged to include, among other things, the consequences of federal and state investigations, stockholder and whistleblower lawsuits, loss of good will, and declines in the value of Columbia stock.

Needing to overcome the failure to make a pre-suit demand, plaintiffs alleged that a majority of the Board of Directors had an interest in the wrongdoing or could not exercise independent judgment with respect to the asserted claims. Plaintiffs challenge the disinterest and independence of all but one of the Board's ten members; the one exception being

The district court first found that Ford's affidavit could not be considered because it was attested to after April 8, 1997. However, facts in existence before the derivative claims were filed but not discovered until later, may be considered in determining demand futility. *See, e.g., Levine v. Smith*, 591 A.2d 194, 204-05 (Del. 1991); *Harris v. Carter*, 582 A.2d 222, 224 (Del. Ch. 1990). Alternatively, the district court concluded:

> To be sure, any criminal investigation of a corporation should alert its directors, but given Columbia's corporate size, the fact that as of April 8, 1997, unlawful activities occurred in one office out of 300 facilities across the nation and the world, would not support an inference of corporate-wide criminal conduct.

This conclusion erroneously views the search of the El Paso offices in isolation. When the particularized allegations are taken together, there are sufficient facts from which one could infer that the Board knew of or recklessly disregarded the allegedly improper policies and practices being systematically followed in Columbia's facilities nationwide. In fact, the magnitude and duration of the alleged wrongdoing is relevant in determining whether the failure of the directors to act constitutes a lack of good faith. *See In re Oxford Health Plans, Inc.*, 192 F.R.D. 111 (S.D. N.Y. 2000) (Del. law).[15]

## 5. *New York Times'* Investigation

On March 20, 21, and 28, 1997, several articles appeared in the *New York Times*, which allegedly "confirmed the massive scope and longstanding nature of the government's investigation." A study of the billing records for 30 million Medicare patients in Texas and Florida revealed that Columbia employees were provided lists of codes to be

---

[15]Although plaintiffs argue that the district court erred by disregarding the judicial determinations of probable cause which were made in connection with the thirty-five search warrants, those determinations had not been made as of April 8, 1997.

the Board's failure to take action or investigate under the circumstances was not in good faith.[14]

### 4.    Federal Investigations

On March 19, 1997, federal agents from four federal agencies, the FBI, IRS, Department of HHS, and Department of Defense Criminal Investigation Service, executed search warrants on Columbia's offices in El Paso, Texas. Plaintiffs alleged that the warrants were executed in connection with a nationwide federal investigation of Columbia that had been ongoing since at least mid-1995. In July 1997, federal agents raided thirty-five Columbia facilities in six more states for evidence relating to laboratory billing and home health care operations. The July warrants were supported by the affidavit of FBI Agent Joseph Ford, to which he attested on July 7, 1997.

Agent Ford stated that, after interviews with witnesses across the country, including current and former Columbia employees, the FBI "has uncovered a systemic [sic] corporate scheme perpetrated by corporate officers and managers of Columbia's hospitals, home health agencies . . . and other facilities in the States of Tennessee, Florida, Georgia, Texas and elsewhere to defraud Medicare, Medicaid and CHAMPUS." Ford also stated that Columbia was being investigated by the Justice Department, the Postal Inspector, and at least eleven other states.

---

[14]In defending against the *Thompson* lawsuit, the Columbia defendants argued that even if there were violations of federal laws, they did not constitute violations of the False Claims Act. The Fifth Circuit reversed in part and remanded for further factual development on the question of whether payments for services identified in annual cost reports were conditioned upon the defendants' certifications of compliance with the laws. The court affirmed the finding that the statistical studies failed to allege fraudulent billing practices with sufficient particularity. On remand, the defendants' new motion to dismiss was denied. *See Thompson*, 20 F. Supp.2d 1017 (S.D. Tex. 1998).

Sister Judith Ann Karam.[5] Eight of the directors were named as defendants in *McCall* and the ninth challenged director, Carl Reichardt, was named as a defendant in *LSERS*. There is no dispute that the claim of demand futility must be evaluated as of April 8, 1997, the date that the first derivative claims were made in the *Morse* action.

Defendants' several motions to dismiss were referred to a magistrate judge for report and recommendation. The magistrate judge outlined the allegations in considerable detail, analyzed the grounds upon which plaintiffs claimed a demand would have been futile, and concluded that the plaintiffs had not shown that a majority of the directors were interested or lacked independence at the time the *Morse* complaint was filed. Over plaintiffs' objections, the district court adopted the findings of the magistrate judge and dismissed the complaint in a brief memorandum opinion.[6] Timely appeals were filed by plaintiffs in *McCall* and *LSERS*.

### II.

### A.   Applicable Standard of Review

A district court's decision to dismiss under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*. Ordinarily, a motion to dismiss under Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

---

[5]The SEC filings indicate that Karam, who joined the Board in May 1996, is a Major Superior of the Sisters of Charity of St. Augustine, has extensive experience as a hospital administrator, and is a Fellow in the American College of Healthcare Executives.

[6]The magistrate judge amended his report after learning that four individuals who were named in the *Morse* action and discussed in his report were not actually directors at the relevant point in time. The magistrate clarified that this correction did not affect his recommendation because only one director was found to have been interested. The district court's order mistakenly states that the magistrate found two directors were interested.

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In a shareholder derivative action, Fed. R. Civ. P. 23.1 requires that the plaintiff "allege with particularity" the reasons for failing to make a pre-suit demand. The same pleading requirement, adopted in Delaware Chancery Rule 23.1, was succinctly described as follows:

> Pleadings in derivative suits are governed by Chancery Rule 23.1, [which] . . . must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim.

*Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (footnote omitted).

LSERS separately argues that demand futility is a procedural question governed by Tennessee state law. To the contrary, the Supreme Court made clear in *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108-09 (1991), that whether the failure to make a demand is excused must be determined under the substantive law of the state of incorporation. The Court held that the law of the state of incorporation controls even when derivative claims are brought under federal law. *Id.* at 96-97. The pleading requirement of Fed. R. Civ. P. 23.1 is the procedural embodiment of the substantive principle that a stockholder's right to prosecute a derivative suit is limited to situations in which demand is excused because either the directors were incapable of making an impartial decision, or the directors

### 3.   *Qui Tam* Action

James Thompson, M.D., a doctor practicing in Corpus Christi, Texas, filed a *qui tam* action under the federal False Claims Act, *see* 31 U.S.C. § 3729. Thompson alleged that Columbia, and entities controlled by it, used investment and other financial arrangements to induce physicians to refer Medicare patients, which allegedly violated federal laws. Thompson also claimed Columbia engaged in fraudulent billing for unnecessary services.

The *Thompson* complaint was unsealed in September 1995, when the government declined to intervene in the action. In fact, Columbia's 1995 10-K form filed with the SEC described the action as having alleged "that the defendants (the Company and certain subsidiaries and affiliated partnerships) engaged in a widespread strategy to pay physicians money for referrals and engaged in other conduct to induce referrals" in violation of federal law. We may infer from this disclosure that the Board was aware of the lawsuit.

In discounting the importance of the *Thompson* action, the district court relied upon the fact that the complaint was dismissed in July 1996 and remained so until the dismissal was reversed in part by the Fifth Circuit in October 1997. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 938 F. Supp. 399 (S.D. Tex. 1996), *rev'd in part*, 125 F.3d 899 (5th Cir. 1997). As a result, the district court concluded that the dismissed complaint would not have constituted a "red flag" as of April 8, 1997. In doing so, the district court misapprehended the significance of the lawsuit. We are not asked to determine whether red flags were present on April 8, but whether on that date the Board could have disinterestedly and independently considered a stockholder demand to sue for breach of the duty of care. Even though the action had been dismissed, it clearly presented claims of improper physician inducements and illegal billing practices. Further, as a *qui tam* action, the *Thompson* lawsuit implicated federal review of the claims and possible federal intervention. We find that the *Thompson* claims were relevant to the question of whether

practices because they were former directors or officers of companies acquired by Columbia. However, the complaint did not allege with particularity any improper activity in those transactions. To conclude from their prior affiliation alone that they were aware of allegedly illegal acquisition practices would be speculation. Of these five directors, only Frist was alleged to have been personally involved in Columbia's acquisition activities. While we agree with the district court that there is nothing improper or illegal *per se* about either "expansion by acquisition," or lobbying on behalf of a particular transaction, the participation of Scott and Frist implies knowledge of the arrangements that allegedly violated health care laws and regulations.

Claiming that Columbia interfered with physician relationships in pursuit of its acquisition goals, plaintiffs specifically alleged that Scott was personally involved in causing a doctor to defraud his partner out of his interest in their oncology partnership. A letter from Scott, which was admitted at trial, offered inducements to Dr. Aboud to disassociate himself from Dr. Schlichtemeier. The jury awarded Schlichtemeier $6.2 million, including $5 million in punitive damages against Columbia. Plaintiffs' complaint stated only that: "The Board was unquestionably aware of this case."

Observing that the complaint did not indicate when the verdict was rendered, the district court found that even if it was rendered before April 8, 1997, the verdict alone was not suggestive of corporate-wide wrongdoing. While we agree that the lawsuit did not necessarily warn that improper practices were being employed systematically, the lawsuit as well as the verdict should be considered with all of the facts.[13]

---

[13]Plaintiffs state on appeal that the verdict was rendered on February 11, 1997.

wrongfully refused a demand to sue. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).[7]

## B.    Demand Futility Test

A basic premise of corporate governance under Delaware law is that the directors, rather than the shareholders, manage the business and affairs of the corporation. *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). Yet, shareholders are not powerless to challenge director action that harms the corporation. "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management." *Id.* Because derivative suits challenge the propriety of decisions made by directors under their authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." *Rales*, 634 A.2d at 933.

The district court concluded that because this case involved the "absence of a conscious board decision," demand futility should be evaluated under the *Rales* test rather than the *Aronson* test. We agree. The test articulated in *Aronson* provides that demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) [a majority of] the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." 473 A.2d at 814. In *Rales*, the court recognized that not all derivative suits fall under the paradigm addressed by the *Aronson* test.

Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no

---

[7]When a demand is made and refused, stockholders may only pursue the derivative action if the board's refusal is not protected by the business judgment rule. *See Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997) (*overruled on other grounds by Brehm,* 746 A.2d at 253); *Rales*, 634 A.2d at 935 n.12.

application.   The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by *Aronson* – whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction.

*Rales*, 634 A.2d at 933 (citation omitted).

Plaintiffs ask us to conclude that the Board's failure to take action with respect to the systematic fraud occurring at Columbia was tantamount to a conscious decision to refrain from acting.   Plaintiffs' duty of care claims, however, arise out of allegations of nonfeasance by the Board (*i.e.,* "intentional ignorance of," or "willful blindness to" the "red flags" that were signs of potentially fraudulent practices) and challenge the Board's failure to take action or investigate under the circumstances.   The claims do not allege a conscious Board decision to refrain from acting.

Under *Rales* then, the court must determine "whether or not the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."   *Rales*, 634 A.2d at 934.   To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility.   *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988).   Nor must plaintiffs demonstrate a reasonable probability of success on the merits. *Rales,* 634 A.2d at 934.   Further, whether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together. *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990).[8]

---

[8]Since the claims based upon insider trading also did not involve any Board decision, we also apply the *Rales* test to determine whether demand can be excused for those claims.

average CMIs in all 22 states where it operated hospitals. The district court found that, since HCA received hundreds of millions of dollars in reimbursements, HCA's payment of $475,000 plus $1.1 million in reimbursement for unsupportable or questionable expenditures did not suggest corporate-wide fraud at HCA.   While that may or may not be true, one nonetheless may reasonably infer that the directors who had prior experience managing HCA would be sensitive to the circumstances that prompted the investigation of HCA's practices.

As for the above-average percentage of cases billed under the highest DRGs, the district court concluded that "given that Columbia is the largest firm in these federal health programs; that Columbia owned over eighty percent (80%) of the top 50 hospitals in the country; and that Columbia adopted a corporate strategy to pursue acute care patients in hospitals of 150 patients or more, one could reasonably expect that Columbia's DRGs and MCIs would be higher than the norm of most hospitals in Columbia's markets."   We find that it would be just as reasonable to infer that the consistently high CMIs and DRGs was a sign of possible improper billing activities.

### 2.   Acquisition Practices

The entire Board allegedly received regular reports about the company's acquisition program, including the structure of the various transactions and the anticipated performance of target companies.   Scott and Frist regularly attended meetings of Columbia's Acquisition Development Group and were privy to the details of the transactions.   Frist engaged in active lobbying of government officials on numerous occasions to secure approvals for acquisitions.   It is also alleged that some executives reported to the FBI that they were offered personal benefits and perquisites while Columbia was negotiating for the purchase of their hospitals.

Plaintiffs assert that five of the directors—Frist, McWhorter, MacNaughton, Young, and Reichardt—must have been familiar with Columbia's improper acquisition

increase in the proportion of complex DRGs being billed and pressured Columbia's facilities to achieve 15 to 20% growth. Plaintiffs alleged that the directors knew that such a rate of growth was not realistically attainable absent fraud. Several executives allegedly told the FBI that the challenged practices resulted from corporate policies that emanated from Columbia's headquarters.

In 1995, Frist allegedly gave "fellow executives" an article from *Business Week* that was critical of another company's pressure to meet aggressive growth targets that led to "inflated sales figures" and "questionable accounting methods." Finding no allegations that other Board members were aware of the article, the district court concluded that giving the article to others was understandable and did not give rise to an inference of "sinister motives." It is not necessary that plaintiffs allege facts showing a sinister motive. Rather, the incident suggests that Frist may have been sensitive to the danger that aggressive growth targets could result in questionable billing practices.

In particular, plaintiffs contend that the directors should have been alerted by the rate of increase in complex DRGs and CMIs experienced at hospitals after they were acquired by Columbia. As an example, plaintiffs alleged that one year after Cedars Medical Center was acquired by Columbia, its percentage of respiratory cases billed under DRG codes with the largest reimbursement went from 31% to 76%. It then rose to 93%, while a hospital located across the street—but not owned by Columbia—billed only 28% of its respiratory cases under the highest DRG codes.

Plaintiffs also rely on allegations that HCA, which had higher than average CMIs, was investigated for and settled allegations of questionable billing, cost reporting, and marketing practices. Frist was president and CEO of HCA; Reichardt, MacNaughton, and Royal were directors; and Royal was a member of HCA's Audit Committee. Healthtrust, of which McWhorter was chairman and CEO and MacNaughton was a director, also had routinely higher than

We agree with plaintiffs that the district court, in adopting the magistrate judge's report and recommendation, erred by viewing the factual allegations separately and by refusing to draw reasonable inferences in plaintiffs' favor. Rather than focusing upon the plaintiffs' claims of error, we review *de novo* the question of whether plaintiffs alleged with sufficient particularity facts that create a reasonable doubt as to the disinterestedness and independence of a majority of the directors.

A director is considered interested when, for example, he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales*, 634 A.2d at 936. While the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director. *See Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815); *In re Baxter Int'l, Inc., S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995).

In this case, plaintiffs maintain that reasonable doubt arises from the likelihood of liability on the part of at least five directors for intentional or reckless breach of the fiduciary duty of care.[9] Plaintiffs also contend that at least five of the directors were interested by virtue of having obtained financial benefits from insider trading of Columbia stock in violation of their duty of loyalty.

---

[9] Plaintiffs have abandoned their claim for *negligent* breach of the fiduciary duty of care. This is understandable since director liability under Delaware law is predicated upon concepts of gross negligence. *See Aronson*, 473 A.2d at 812.

## C.    Intentional or Reckless Breach of the Duty of Care

The contours of director liability for breach of the duty to exercise appropriate attention to potentially illegal corporate activities were discussed in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del Ch. 1996). There, the court explained that this was "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967. Director liability for such a breach may arise (1) from a board decision that resulted in a loss because the decision was ill-advised, or (2) from "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *Id.* As discussed earlier, the duty of care claims in this case fall into the second category as they arise from the Board's failure to act under the circumstances. The court in *Caremark* held that when director liability is predicated upon ignorance of liability creating activities "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id.* at 971.

Unconsidered inaction can be the basis for director liability because, even though most corporate decisions are not subject to director attention, ordinary business decisions of officers and employees deeper in the corporation can significantly injure the corporation and make it subject to criminal sanctions. *Id.* This theory grew out of an earlier decision, in which the Delaware Supreme Court explained that:

> the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him.

### 1.    Audit Committee

The Board's Audit Committee was charged with reviewing the programs of Columbia's internal auditors, the results of their audits, and the adequacy of Columbia's system of internal controls and accounting practices. The Audit Committee also reported to the rest of the Board. It is alleged that Columbia's internal audit staff audited its hospitals nationwide, focusing "primarily on those areas that affect the Company's profit margin" and addressing "issues with legal ramifications that may include possible violations of law."[11]

Plaintiffs contend that information provided by the audits about Columbia's reimbursement practices would have shown unmistakable signs that improper practices were being employed throughout the corporation. Specifically, the reports allegedly indicated discrepancies between cost reports submitted to the government and secret reserve reports;[12] improper inclusion of money spent on physician recruitment, marketing, and advertisement with claims for patient care reimbursement; improper shifting of costs from inpatient to outpatient services to get higher reimbursement rates; and extra fees paid to referring physicians.

Plaintiffs also alleged that the audits provided statistical evidence of widespread illegal "upcoding" in the form of consistently above-average reimbursements for illness billed under the highest DRG codes, which were reflected in the case mix index (CMI). Scott allegedly reviewed the rate of

---

[11]While the audit procedures failed to prevent the alleged fraud, the Board assured that nationwide audits, internal and external, were undertaken with attention to areas that could have legal ramifications for Columbia. As a result, we agree with the district court that there is not a substantial likelihood of liability based upon a failure to assure that reasonable reporting systems existed.

[12]At one hospital, 100% of a long-term loan was erroneously attributed to capital, and the auditors concealed the error from the government. A $3.7 million reserve was set aside in case the error was discovered.

*Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963). Since then, the Delaware Supreme Court specifically adopted gross negligence as the standard for measuring a director's liability for a breach of the duty of care. *See Aronson,* 473 A.2d at 812; *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

After reviewing the cases, we cannot agree with the district court's conclusion that *Caremark* requires a director to have *intentionally* acted to harm the corporation. While defendants do not deny that something less than intentional conduct may state a claim under *Caremark*, they argue instead that intentional conduct is required to overcome the waiver of liability adopted by Columbia pursuant to Delaware statute. *See Caremark*, 698 A.2d at 970 n.27; DEL. CODE ANN. § 102(b)(7). Columbia's Restated Certificate of Incorporation provides as follows:

> *TWELFTH:* A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; *provided, however,* that the foregoing shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

When the validity of such a provision is not contested and the factual basis for the claims implicates only a breach of the duty of care, the waiver may properly be considered and applied in deciding a motion to dismiss for failure to make a pre-suit demand. *Baxter Int'l,* 654 A.2d at 1270; *Rothenberg*

---

In 1995, the Audit Committee of Columbia's Board consisted of Averhoff, Reichardt, and Long. In 1996, MacNaughton replaced Long. Averhoff, a physician practicing in Miami, Florida, became a Columbia director in 1992. She had an equity interest in a partnership that held a minority investment in Cedars Medical Center; a Columbia acquisition located in Miami, Florida. MacNaughton was a former Chairman and CEO of both HCA and Prudential Insurance Company. He also had retired from Healthtrust, where he had served as Chairman of the Executive Committee.

Reichardt became a Columbia director in 1994 and was Chairman of its Audit Committee. Reichardt was Chairman and CEO of Wells Fargo & Company and its subsidiary Wells Fargo Bank from 1983 until 1994. During that time, Wells Fargo provided substantial financial backing to HCA. Since then, Wells Fargo has provided $101.2 million of a $3 billion credit facility to Columbia.

Long became a Columbia director in 1991 and served on the Board's Audit and Compensation Committees. Long is a partner in a private banking firm and co-manager of The 1818 Fund, L.P., which purchased a $40 million Columbia note in 1991.

Given their prior experience, plaintiffs maintain that the failure of these directors to act was the result of an intentional or reckless disregard of the "red flags" that warned of the systematic fraudulent practices employed and encouraged by Columbia management. In particular, plaintiffs alleged that intentional or reckless disregard can be inferred from the failure to act in the face of audit information, ongoing acquisition practices, allegations brought against Columbia in a *qui tam* action, the extensive federal investigation, the *New York Times'* investigation into Columbia's billing practices, and inaction by the Board prior to July 26, 1997.

*v. Santa Fe Pac. Corp.*, C.A. 11749, 1992 WL 111206 (Del. Ch. May 18, 1992).[10]

Plaintiffs maintain that their duty of care claims are not barred as the second exception excludes protection from director liability for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." Although plaintiffs urge us to interpret "intentional misconduct" to include "recklessness," we do not believe the Delaware Supreme Court would interpret the provision in this way. Still, it is unclear whether some reckless acts or omissions may be excluded from the protection of provisions adopted pursuant to § 102(b)(7). As one treatise explained:

> Whether the statute would protect a director against reckless acts is not altogether clear. To the extent that recklessness involves a conscious disregard of a known risk, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under the new statute. On the other hand, to the extent that the conduct alleged to be reckless is predicated solely on allegations of sustained inattention to the duty it is arguable whether such conduct is "grossly negligent," but not conduct amounting to bad faith.

BALOTTI & FINKELSTEIN, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.29 at 4-116 to 4-116.1 (3d ed. Supp. 2000). Thus, we find the district court erred in concluding that only intentional conduct would escape the protection of the provision adopted in Columbia's Restated Certificate of Incorporation.

---

[10]Since the protection of such a provision is in the nature of an affirmative defense, a defendant seeking exculpation bears the burden of establishing its elements. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999). As a result, it is not the plaintiff who must establish bad faith at trial, but the defendant who bears the burden, however slight, to show good faith. *Id.* In the context of determining demand futility, of course, no evidence is required since the issue is whether the particularized factual allegations are sufficient to create doubt about the disinterestedness and independence of a majority of the directors.

## D. Plaintiffs' Particularized Allegations

We find that the particularized facts, when taken together, are sufficient to present a substantial likelihood of liability on the part of at least five of Columbia's directors, which creates a reasonable doubt as to the disinterestedness of a majority of the Board as of April 8, 1997. At the same time, we caution that this conclusion involves only the sufficiency of the pleadings with respect to demand futility and reflects no opinion as to the truth of the allegations or the outcome of the claims on the merits.

A significant factor in our assessment of the factual allegations was the prior experience of a number of the defendants as directors or managers of health care organizations that were acquired by Columbia. Frist was Vice Chairman of Columbia's Board from 1994 until July 26, 1997, when he was appointed to succeed Scott as Chairman and CEO. Frist had been President and CEO of Hospital Corporation of America (HCA) from 1978 until it was acquired by Columbia in 1994.

McWhorter served as Columbia's Chairman for one year at an annual salary of $600,000 after Columbia acquired Healthtrust, Inc.--The Hospital Company (Healthtrust) in 1995. He terminated his employment in 1996, but continued to serve as a director. McWhorter was Chairman and CEO of Healthtrust from 1991 to 1995. He was also COO and a director of HCA from 1985 to 1987.

Royal, a physician practicing in Richmond, Virginia, became a member of Columbia's Board in 1994 and has served on Columbia's Compensation Committee, which approves compensation arrangements for management, grants stock options, and reviews employee compensation policies. Before joining Columbia's Board, Royal had been a director of HCA and a member of its audit committee. Young, who joined Columbia's Board in 1993, was Chairman of Columbia's Compensation Committee. Young had previously been a board member and Chairman of the Executive Committee of Humana, Inc.