Brassard, J.
This is a stockholders’ derivative action brought by plaintiffs, asserted shareholders of PolyMedica Corporation (“PolyMedica”), for the benefit of nominal defendant PolyMedica. On October 17, 2001, this court entered an order consolidating five separate derivative suits. On December 5, 2001, pursuant to a request by the parties, the Chief Justice of the Superior Court ordered that this court be specially assigned to the matter. The plaintiffs filed a consolidated verified derivative complaint (“Complaint”) on December 17, 2001 alleging that defendants, officers and directors of PolyMedica, breached their fiduciary duties of loyalty and due care resulting in damages to PolyMedica. The defendants now bring this motion to dismiss pursuant to Mass.R.Civ.P. 23.1 and 12(b)(6). For the reasons set forth below, the defendants’ Motion to Dismiss is DENIED.
*116 BACKGROUND
The following facts are summarized as alleged in the plaintiffs’ complaint and in the documents attached and incorporated in the complaint. See Harhen v. Brown, 431 Mass. 838 (2000).
The plaintiffs, Roberta Casden, Eugene Sullivan, Michael Vezmar, Alan Messner, and Gregory Minasian (“plaintiffs”) brought this action as asserted shareholders on behalf of and for the benefit of PolyMedica. PolyMedica is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal executive office located in Woburn, Massachusetts. Through Liberty Medical Supply (“Liberty”), a subsidiary of PolyMedica located in Port St. Lucie, Florida, it sells diabetes testing equipment and other medical supplies. The named defendants include: Steven S. Lee (“Lee”), PolyMedica’s Chief Executive Officer since 1990 and PolyMedica’s Chairman of the Board since 1996; Arthur A. Siciliano (“Siciliano”), PolyMedica’s president; Eric G. Walters (“Walters”), PolyMedica’s Chief Financial Officer; Herbert A. Den-ton (“Denton”), a PolyMedica director since 2000; Thomas S. Soltys (“Soltys”), a PolyMedica director since 1996; Frank LoGerfo (“LoGerfo”), a PolyMedica director since 1994; Marcia J. Hooper (“Hooper”), a PolyMedica director since 1991; and Daniel S. Bernstein (“Bernstein”), a PolyMedica director since 1992 (“defendants”).
PolyMedica purchased Liberty in 1996 and has since reported rapid growth in revenues. Up to 95% of PolyMedica’s reported income before taxes is attributable to Liberty. (Complaint, ¶24.) Liberty sells diabetes testing equipment and other medical supplies primarily by direct mail and mainly to Medicare patients. (Complaint, ¶25.) According to PolyMedica’s advertising materials, customers had the option to bill Medicare or their insurance company directly for PolyMedica products. (Complaint, ¶25.) In 1999, PolyMedica reported $157 million in revenues, 80% of which were attributed to diabetes-testing kit sales and 70% of its reported total revenues came from Medicare. (Complaint, ¶25.)
Since 1996, PolyMedica’s sales, margins, and profits were artificially bolstered and unlawfully inflated by fraud at Liberty perpetrated by the senior management of PolyMedica against its customers, Medicare, taxpayers, investors in stock, insurance companies and HMOs. (Complaint, ¶26.) Defendant Lee set unattainable quarterly sales goals for PolyMedica and Liberty in order to meet and exceed Wall Street earnings expectations. (Complaint, ¶27.) Liberty’s senior management subtasked these goals to Liberty sales personnel resulting in a system of fraudulent sales and unrecognized returns; those who failed to attain the goals were terminated or sanctioned.[1] (Complaint, ¶ ¶27, 28.) At the end of each fiscal quarter a “shipping blitz” occurred whereby large quantities of Liberty’s products were allegedly “pushed out” on any pretext including situations where there was insufficient documentation and instances where customers had not ordered products or were even deceased. (Complaint, ¶29.) Liberty management required its employees to work overtime to meet quarterly goals and ordered employees to backdate orders and documentation, forge authorizations, submit orders for goods that had not been ordered, and override accounting controls. (Complaint, ¶29.) As a result of the work demand, there was a high turnover rate among Liberty sales personnel. (Complaint, ¶30.) Nonetheless, PolyMedica was able to meet and/or exceed Wall Street earnings estimates resulting in stock price appreciation. (Complaint, ¶30.)
Liberty failed to deduct from sales commissions any product returns made to Liberty, even orders that customers denied making or for which documentation was missing. (Complaint, ¶31.) Most of the customers were aged diabetics on Medicare and many were partially blind and/or infirm. (Complaint, ¶32.) Of the total “orders” shipped by Liberty, 10% to 15% were returned and on some occasions the volume of returns was equal to the average daily volume of shipments. (Complaint, ¶33.) PolyMedica had not established procedures for handling the high rate of returns made at Liberty in violation of Generally Accepted Accounting Principles (“GAAP”) and industry standards and practices.[2] (Complaint, ¶37.) Liberty failed to process returns for months at a time. (Complaint, ¶34.) Thousands of returned orders were unaccounted for and sat in Liberty’s returns area. (Complaint, ¶34.) When returns were processed, Liberty failed to debit sales revenues and accounts receivable as well as to report the returns to third-party payors including Medicare or insurance companies. (Complaint ¶35.) The products were frequently returned to Liberty’s inventory shelves without any accounting entry. (Complaint, ¶35.) There was little if any managerial oversight of individuals working within the accounting department at Liberty. (Complaint, ¶36.) Liberty employees repeatedly informed members of Liberty’s senior management, including Mark Libratore, Liberty’s president, of the practices and were “ignored, threatened or sanctioned.” (Complaint, ¶38.)
As of September 14, 2000, the directors comprising PolyMedica's Audit Committee[3] lacked the necessary financial experience to exercise any oversight over PolyMedica’s accounting, auditing, and external financial reporting. (Complaint, ¶41.)
Defendant Lee was the principal figure behind the fraud at Liberty and the remaining defendants were parties to the scheme or, at a minimum, “turned a blind eye and permitted Lee to repeatedly deny the fraud” up to and as late as August 21, 2001. (Complaint, ¶39.) Lee’s public denials were made after months of news reports that PolyMedica was under investigation by the Federal Bureau of Investigation, the Securities and Exchange Commission, and state *117 attorneys general. (Complaint, ¶39.) The improper and fraudulent business practices constituted “inside information” not known to the investing public.
The defendants’ actions, or “willfulblindness” to the improper practices constituted violations of the defendants’ fiduciary duties. (Complaint ¶20.) The defendants thereby permitted and/or caused PolyMedica to “conduct its business in an unsafe, imprudent and dangerous manner” by (i) failing to ensure that senior management and employees complied with federal law; (ii) failing to investigate credible accusations of corrupt and illegal business practices at Liberty; (iii) failing to remedy the corrupt and unlawful business practices at Liberty; (iv) permitting Lee to falsely deny the unlawful business practices; (v) failing to correct Lee’s denials; (vi) permitting Liberty to violate anti-fraud provisions of the federal securities laws; (vii) permitting defendants who sold shares of stock to gain insider trading profits; (viii) failing to act in good faith in managing, conducting, and supervising the officers and employees ofPolyMedica; and (viii) failing to maintain systems for the defendants to obtain the information necessary to supervise, manage and control PolyMedica’s operations and employees. (Complaint ¶21.)
All defendants were in possession of this “inside information” related to the improper business practices and all but one defendant[4] as a result of this information, sold shares ofPolyMedica common stock from their personal holdings in breach of their fiduciary duties of loyalty and good faith.[5] (Complaint, ¶ 13.) Specifically, four of the six board members, Lee, Soltys, LoGerfo, and Bernstein, directly profited from trading on PolyMedica’s inside information and they were in possession of material, non-public adverse information when they collectively sold shares of common stock in the open market.[6] Additionally, certain director defendants were subject to disabling conflicts of interest through their business relationships to one another.
In support of their claims, the plaintiffs also allege that there is a relationship among public offerings of common stock, sales of stock by certain defendants, issuances of press releases reporting allegedly inflated earnings and fiscal results, and the asserted effect of the reported revenues on the price of PolyMedica’s common stock from the Fall of 1999 to December 2001. (Complaint ¶¶41-76.) As a result of their “responsibility for, and access to, material non-public information regarding the Company’s operations, the Defendants knew or should have known that the market had been misled by the Company’s public disclosures regarding its possible legal exposure related to the Company’s improper acts.” (Complaint ¶19.) In addition, the plaintiffs detail the contents of a series of published news articles beginning in November 2000 reporting allegations of Medicare fraud at PolyMedica and Lee’s series of responses to such reports. (Complaint ¶¶57-78.)
Specifically, the plaintiffs allege that in the fall of 1999, PolyMedica completed a second public offering of its common stock. (Complaint ¶42.) During this second offering and with knowledge of inside information unknown to the public, Lee, Siciliano, Walters, and Bernstein sold common stock.[7] (Complaint, ¶42.) Despite the defendants’ knowledge of the inside information and improper practices at Liberty, PolyMedica continually reported “record” results to the public.[8] (Complaint, ¶42.)
From January 21, 2000 until March 9, 2000, Lee, Walters and Siciliano sold collectively more than 116,000 shares ofPolyMedica common stock. (Complaint, ¶44.) Such sales were not part of a normal or regular pattern or practice of stock sales for the respective defendants, but rather were unusual in timing and amount.[9] (Complaint, ¶45.)
On May 11, 2000, PolyMedica reported record results for its fourth quarter.[10] (Complaint ¶45.) This press release had an immediate impact on the price of PolyMedica’s common stock which rose from $39.87 on May 11, 2000 to $41.87 on May 12, 2000. (Complaint, ¶47.) During the following two weeks, the stock price reached a high of $46 before declining to $25.93 on June 1, 2000. (Complaint ¶48.) After the markets closed on June 1, 2000, PolyMedica issued a press release entitled, “PolyMedica Sees ‘Disconnect’ Between Its Market Valuation and Its Strong Business and Demographic Fundamentals.” (Complaint, ¶48.) In that release, PolyMedica and Lee stated, among other things, “we believe that our current multiple does not reflect PolyMedica’s historic or current rate of growth and that the stock market has created a significant buying opportunity in our stock. We are aware of no developments on either the business or regulatory front that would alter the very positive outlook we have for this fiscal year and beyond. The fundamentals of our business remain intact.” (Complaint, ¶48.) The press statement had an immediate, material effect on PolyMedica’s stock price which went from $25.93 on June 1, 2000 to $31.87 at the close of June 2, 2000.[11] (Complaint, ¶49.)
Thereafter, in June 2000, Lee and Walters, while in possession of inside information, exercised their stock options and sold shares of PolyMedica common stock.[12] (Complaint, ¶50.) On June 13, 2000, the day after Lee’s last June 2000 sale, PolyMedica issued an announcement declaring that the Board approved a share repurchase plan whereby PolyMedica, through its corporate treasury, would purchase up to 1 million shares of common stock on the open market. (Complaint, ¶52.) Lee publicly commented stating that “(w)ith strong fundamentals continuing to drive profitable growth for PolyMedica, we intend to invest in our own stock when we believe that the stock market is *118 not adequately taking our performance and prospects into account.” (Complaint, ¶52.)
Despite the publicly announced repurchase plan and Lee’s comments, Siciliano, Walters, Logerfo, Soltys, Bernstein and Lee sold collectively more than 140,000 shares of PolyMedica common stock between June 14, 2000 and October 31, 2000.[13] (Complaint, ¶53.) These sales were not part of any ordinary pattern or practice of PolyMedica stock stales and were unusual in timing and/or amount. (Complaint, ¶54.)
On November 20, 2000, Barron’s financial news publication reported that PolyMedica was the subject of an FBI investigation into Medicare fraud. (Complaint, ¶55.) PolyMedica issued a press release denying knowledge of any FBI investigation and affirmed the conformity of its business practices to all regulatory guidelines.[14] (Complaint, ¶56.) That day, in a conference call with securities analysts assigned to track PolyMedica, Lee strongly denied the allegations appearing in Barron’s and verified the accounting and shipping procedures at Liberty as appropriate and in conformity with established procedures. (Complaint, ¶57.) By the close of the day, the price of PolyMedica common stock dropped from $51.16 to $25.75. (Complaint, ¶58.) On November 21, 2000, PolyMedica announced that it was repurchasing up to 1 million shares of its common stock in the open market pursuant to the Board’s June 2000 authorization. (Complaint, ¶59.)
On November 27, 2000, the first of several shareholder actions against Lee and PolyMedica was filed in federal court. (Complaint, ¶60.) On November 28, 2000, Lee refuted the allegations of the suits and denied any knowledge of an FBI investigation. Lee asserted that the FBI had not made any contact with PolyMedica and that PolyMedica’s practices were in strict compliance with applicable regulatory requirements. (Complaint, ¶60.) On November 30, 2000 the stock price fell to $22.81 per share and slowly began to recover reaching a $44.00 high on January 18, 2001[15] at which time PolyMedica announced that it was increasing its earnings estimates for the fourth fiscal quarter of 2001 and the 2002 fiscal year. (Complaint, ¶63.)
On March 23, 2001, PolyMedica disclosed that it had received a copy of a Freedom of Information Act response to an analyst query relating to all investigations of PolyMedica conducted by any government agency. (Complaint, ¶64.) The report indicated that in June of 1999 there were four situation reports involving customer complaints.[16] (Complaint, ¶64.) On March 23, 2001, PolyMedica’s common stock price dropped from $33.68 to $17. (Complaint, ¶65.)
On March 30, 2001, TheStreet.com published an article reporting that PolyMedica was the subject of an FBI investigation based on information received from a former PolyMedica employee who stated that she was interviewed by an FBI agent. (Complaint, ¶66.) The article also reported information related to an additional investigation conducted by the organization responsible for paying claims on behalf of Medicare. (Complaint, ¶66.) In addition, two former Liberty employees told TheStreet.com that “delivering supplies that were never ordered and not reimbursing Medicare for products that were returned were common practices between 1996 and 2000.” (Complaint, ¶66.) One employee was quoted as saying “ ‘at one point we were receiving 400 returned packages a day’ from customers who never requested items in the first place . . . the second employee estimated that at one point the Company received as many as 1,000 return packages per day.” The employee also described the billing process: “the Company shipped the product, booked the sale and billed Medicare — but didn’t notify Medicare if the product was returned. The returns just sat on the shelves and we did not do any refunds.” (Complaint, ¶66.) One former employee reported that sales personnel were rewarded with a $50.00 commission for every sale of a device manufactured for male erectile dysfunction. (Complaint, ¶66.) The employee stated that the devices were sent not only to male customers but also to “women and dead people.” (Complaint, ¶66.) The employee stated that some women who had received the devices had called to complain that they never ordered them. (Complaint, ¶66.)
TheStreet.com reported that the FBI declined to confirm or deny the inquiry about its alleged PolyMedica investigation and that PolyMedica officials had stated that they had not been contacted by the FBI. (Complaint, ¶66.) Additionally, Lee, in a phone interview with TheStreet.com, reportedly denied the former employees’ statements about the business practices. (Complaint, ¶66.)
On April 6, 2001 the Stuart News /Port St. Lucie News reported that PolyMedica admitted that FBI investigators had talked to some current and former Liberty employees. (Complaint, ¶67.) In response to the report, Lee emphasized that the FBI’s investigation was focused on civil and not criminal violations and that no member of PolyMedica or Liberty senior management had been directly contacted by the FBI or the Justice Department. (Complaint, ¶67.) Lee also noted that, to date, there had been no assertions of fraud by any government agency. (Complaint, ¶67.)
On July 9, 2001, PolyMedica announced its common stock listing change from NASDAQ to the New York Stock Exchange (“NYSE”). (Complaint, ¶68.) On July 20, 2001, PolyMedica announced that the NYSE had changed its decision to list PolyMedica on the NYSE; subsequently, in one day, the price of PolyMedica’s common stock declined by nearly 30%. (Complaint, ¶70.) On August 4, 2001, Barron's reported additional information concerning the FBI’s alleged investigation and reported that despite Lee’s statements concerning the FBI’s failure to contact any *119 senior management, a federal grand jury was investigating possible Medicare and investor fraud and that, “the [FBI] delivered grand jury subpoenas in late July to several people close to the Company.” (Complaint, ¶71.) On August 5, 2001, PolyMedica issued a press release refuting the Barron’s article and asserting that the allegations regarding the shipping and revenue policies were “patently false.” (Complaint, ¶¶72, 73.) On August 6, 2001, shares of PolyMedica’s common stock fell 32% to close at $20.75. (Complaint, ¶74.)
The plaintiffs allege that while Lee was publicly refuting allegations of improprieties, he was selling off significant amounts of his own PolyMedica stock in privately-negotiated transactions and that on August 6, 2001 Lee sold or disposed of 150,000 shares at prices ranging from $38 to $55 per share. (Complaint, ¶75.) From January of 2000 until August 6, 2001, Lee had sold or disposed of a total of 263,501 shares, or approximately 97% of his holdings. (Complaint, ¶76.) On August 8, 2001, PolyMedica issued a public statement in which Lee admitted to knowledge of a criminal investigation into PolyMedica and asserted that PolyMedica was and had been in full compliance with the law. (Complaint, ¶77.) On August 8, 2001 the stock price declined by 20% and closed at $15.30. (Complaint, ¶78.) Liberty destroyed large amounts of evidence during the summer of 2001, including replacing computer servers containing the transaction data for the alleged bogus transactions. (Complaint, ¶79.) Due to the extent of the alleged Medicare fraud, the plaintiffs assert that the defendants knew or should have known of the Medicare billing issues prior to the Barron’s publication and alternatively, if they did not, the unequivocal denials of the allegations by senior management, the materiality of the stock price decline, and the shareholder lawsuits, put the defendants on constructive notice of such issues as of November 2000. (Complaint, ¶¶82-94.)
The defendants seek to dismiss the Complaint pursuant to Mass.R.Civ.P. 23.1 claiming that the plaintiffs failed to make a demand on PolyMedica’s board prior to bringing a derivative action. Defendants argue that the plaintiffs have not complied with the pleading standards of Rule 23.1 and have failed to allege any particularized facts to create a reasonable doubt that the directors could have exercised independent and disinterested judgment in responding to a demand. Alternatively, the defendants assert dismissal is warranted pursuant to Mass.R.Civ.P. 12(b)(6) for failure to state a claim because the exculpatory clause within PolyMedica’s Articles of Incorporation extinguishes the majority of the plaintiffs’ claims and exculpates the directors from any liability.
DISCUSSION
Ordinarily, a motion to dismiss a complaint should not be allowed pursuant to Mass.R.Civ.P. 12(b)(6) unless “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 35 U.S. 41, 45-46 (1957). When evaluating the sufficiency of a complaint, the court may take into consideration “the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also maybe taken into account." Schaer v. Brandeis University, 432 Mass. 474, 477 (2000) (citation omitted). The court may consider documents referenced in the plaintiffs complaint without converting the motion to dismiss into a motion for summary judgment. See Harhen v. Brown, 431 Mass. 838 (2000), quoting Shaw v. Digital Equip. Corp. 82 F.3d 1194, 1220 (1st Cir. 1996). The court must accept as true the allegations made in the complaint as well as any reasonable inferences favorable to the plaintiff which can be drawn from those allegations. Fairneny v. Savogran Co., 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 416, 429 (1991). Special rules of pleading, however, such as the particularity requirement of Mass.R.Civ.P. 23.1 in derivative actions, should be taken into consideration on a motion to dismiss. See Harhen v. Brown, Civil No. 97-1522-H, 7 Mass. L. Rptr. 598 (Suffolk Super. Ct. August 18, 1997).
Rule 23.1 and the Demand Requirement
Massachusetts Rule of Civil Procedure 23.1 governs the requirements for bringing derivative actions.[17] The Supreme Judicial Court has held that prior to filing a derivative action on behalf of a corporation, the plaintiff “ ‘must establish that ... all available means to obtain relief through the corporation itself are exhausted by making demand on the corporation’s board of directors to prosecute the litigation.” Harhen v. Brown, 431 Mass. 838, 844 (2000), quoting Bartlett v. New York, N.H.&H.R.R., 221 Mass. 530, 532 (1915); Brewer v. Proprietors of the Boston Theatre, 104 Mass. 378 (1870). Rule 23.1 requires the plaintiff to allege “with particularity” the efforts, if any, made to induce desired corporate action by the board. The rule is “ ‘not a technical rule of pleading, but one of substantive right’... the particularity must appear in the pleading itself; the stockholder must not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case." In re Kauffman Mutual Fund, 479 F.2d 257, 264(1973), quoting Bartlett v. New York, 221 Mass. 530, 538 (1915). The rationale underlying this demand requirement is that “as a basic principle of corporate governance, the board of directors or majority of shareholders should set the corporation’s business policy, including the decision whether to pursue a lawsuit.” Harhen, 431 Mass. at 842.
This “demand” requirement, however, maybe excused as futile, in cases where the plaintiff alleges that a majority of directors participated in wrongdoing, or alleges “facts to show that a majority of the board are interested ...” Cote v. Levine, 52 Mass.App.Ct. 435 (2001), citing Harhen, 431 Mass. at 838. “If a majority of the board are interested, demand is excused.” Id.; see also Bartlett v. *120 New York, N.H.&H.R.R., supra at 534-35) (plaintiff not required to make demand on board of directors when demand would be “useless” or “an idle ceremony” because of board’s interested status); S. Solomont & Sons Trust, Inc. v. New England Theatres Operating Corp., 326 Mass. 99 (1950) (“If the majority of the board of directors of a corporation are incorruptible, free from collusion, there is no reason why an individual stockholder should be permitted to involve it in lawsuits”).[18]
The United States Supreme Court has recognized that the demand requirements for a derivative suit are determined by the law of the state of incorporation. See Kamen v. Kemper Fin. Servs., Inc. 500 U.S. 90 (1991) (substantive corporation law of state of incorporation determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied). Demand is not merely “ a technical rule of pleading, but rather one of substantive right.” Bartlett, 211 Mass. at 538.
If demand on the board is made, the board may “institute suit, take action short of litigation to resolve the issues the demanding shareholder has identified, or determine that no action is appropriate at that time." Harhen, 431 Mass. at 865. In the latter instance, commonly referred to a “demand refused” case, the board of directors is presumed disinterested and the “longstanding rule in Massachusetts is that the business judgment rule applies, absent a showing of bad faith or lack of investigation into the demand." Id., at 847.
In the present case, the plaintiffs did not make a demand on PolyMedica’s board of directors and allege in their verified complaint, among other things, that such demand would have been futile because: i) four of the six PolyMedica Board members were interested in the challenged transactions because they directly benefitted from their improper conduct by selling PolyMedica common stock on the open market while in possession of inside information; ii) each defendant as a wrongdoer was legally disabled from considering any demand; iii) defendant Lee’s "control and domination of the board impaired the Board’s ability to validly exercise its business judgment and has rendered it incapable of reaching an independent decision as to whether to bring suit”; iv) a majority of the members of PolyMedica’s Board have debilitating conflicts of interest.
In order to determine whether the plaintiffs’ failure to make a demand is properly excused on the basis of futility, this court must consider whether the plaintiffs sufficiently alleged that a majority of the directors participated in wrongdoing or were otherwise interested. See Harhen, 431 Mass. at 842; Cote, 52 Mass.App.Ct. 435, 441 (2001). “If a majority of the board are interested, demand is excused.” Cote, 52 Mass. App. at 441.
Interested Directors
In derivative actions, the status of a majority of the board as either “interested” or “disinterested” is significant in determining demand futility. See Harhen, 431 Mass. at 842. The Supreme Judicial Court has adopted the definition of an “interested” director as stated in the American Law Institute’s Principles of Corporate Governance. See 1 ALI Principles of Corporate Governance: Analysis and Recommendations §1.23 (1994); see also Harhen, 431 Mass. n. 5; Demoulas v. Demoulas Super Mkts., Inc. 424 Mass. 501, 523-24 (1997) (finding “interestedness” where directors had either a financial or business relationship with interested director, were subject to controlling influence, or “stood to benefit personally from the transactions at issue”).[19]
The Supreme Court of Delaware has stated:
A director is considered interested where he or she will receive a personal benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.
Rales v. Blasband, 634 A.2d 927, 936 (citations omitted).
The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiffs demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in wrongdoing.
Harhen v. Brown, 431 Mass. 838, 843 (2000), citing, Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993).[20] “Mere membership on aboard at the time of the alleged wrongdoing, without more, does not result in interested status.” Harhen, 431 Mass. at 866.
In Harhen, a “demand refused” case, the plaintiff policy holder of a life insurance company made demand on the company’s board of directors to commence litigation alleging that the defendants, directors and employees of the company, harmed the company by participating or acquiescing in illegal lobbying activities. The board, through a decision of a litigation committee comprised of two members, refused the plaintiffs demand and the plaintiff subsequently brought a derivative action challenging the board’s decision and claiming that the demand was wrongfully refused. The Court determined that the plaintiff, by alleging that only three of the eighteen board members were interested, failed to allege that a majority of the board was interested and likewise failed to sufficiently substantiate assertions that the two committee members “lacked disinterest” for the purposes of establishing wrongful refusal.
The Court in Harhen examined the plaintiffs particular allegations pertaining to the status of the two board members on the litigation committee. Because one member joined the board after the alleged wrongdoing occurred, the court noted he could not be considered “interested.” As to the other member, the Court held that *121 the. plaintiffs mere allegation that the director was interested because he was serving on the board at the time of the challenged wrongdoing, without more, could not result in interested status. Id. The Court specifically noted that the complaint contained no allegations that the particular director was a party to the transactions or events underlying the plaintiffs complaint or that the director “had a material pecuniary interest in the transaction or indeed would benefit in any respect from a decision regarding the plaintiffs demand. ” Id., citing Rales v. Blasband, supra at 936-37. The Court therefore concluded that the plaintiff failed to allege sufficient facts that either a majority of the board or its committee was interested to warrant wrongful refusal consideration.[21]
The Appeals Court has recently excused demand pursuant to Mass. Rule 23.1 in a derivative action against the board of trustees of a condominium association. See Cote v. Levine, 52 Mass.App.Ct. 435 (2001). In Cote, the Court applied the definition of interestedness as discussed in Harhen to the plaintiffs allegations in his amended complaint and concluded that the plaintiff had alleged sufficient facts to deem a majority of the board interested to excuse demand.
The plaintiff in Cote, an owner of a condominium unit, did not make demand on the three-member board of trustees. In his amended complaint the plaintiff stated, “(t]here was no need to make demand upon the Defendants . . . because of the adversity of the Defendants which controlled [t]he . . . Condominium Trust at the commencement of this litigation.” The Court noted that the only adversity found in the record related to one of the trustees’s repeated refusals to allow the plaintiff to access and inspect the condominium’s financial records. The Court found that particular trustee interested because “ a director or officer is interested if he is a party to the transaction or conduct.” Id., quoting Harhen, 431 Mass. at 843 n. 5. The plaintiff additionally alleged that the bank that financed the construction of the condominium failed to pay outstanding condominium fees prior to foreclosure. The Court, taking the plaintiffs allegations as true, found that the second trustee on the board, an agent of that bank, was also deemed interested because
a director ... is interested where that director . . . is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct and that controlling influence could reasonably be expected to affect the director’s . . . judgment with respect to the transaction or conduct in a manner adverse to the corporation.
Id., citing Harhen, supra at 843 n. 5.[22]
Rule 23.1 requires that the plaintiffs allege, with “particularity” the reasons for not making demand on the board to take desired action. In the instant case, the plaintiffs urge four grounds for excusing demand; this court will address only the first because it is sufficient.
The Complaint alleges that Lee, Soltys, LoGerfo and Bernstein “sold PolyMedica stock on the open market while in possession of Inside Information collectively reaping proceeds in excess of $9.4 million.” The alleged “Inside Information,” included the fraudulent business scheme designed and implemented by Lee and subsequently subtasked to Liberty management and sales personnel . The scheme included the creation of “absurdly unattainable quarterly sales goals for PolyMedica and Liberty" and a system of “perverse incentives” which induced a high degree of “fraudulent sales and unrecognized returns.” PolyMedica, according to the plaintiffs, did not establish any formal procedures for handling the thousands of alleged returns and Liberty failed to process the returns. Lee was the “principal instigator” of the fraud and the remaining defendants, were
parties to the scheme or, at minimum, turned a blind eye and permitted Lee to repeatedly deny the fraud, even as late as August 21,2001 after months of new reports that PolyMedia was under investigation by the Federal Bureau of Investigation, the SEC, and state attorneys general, and even after PolyMedica had been sued for securities fraud by a class of aggrieved investors.
With respect to the alleged insider trades, the Complaint sets forth a series of PolyMedica common stock sales by the four members of the board[23] and corresponds these sales to public statements issued by the company reporting allegedly inflated earnings. The Complaint alleges that the inflated earnings were attributable to fraudulent practices at Liberty.
Specifically, the Complaint alleges the following with respect to each of the four board members.
Lee
Lee has been PolyMedica’s Chief Executive Officer and a director since 1990 and Chairman of the Board since 1996. Lee was the “chief architect” of the scheme whereby PolyMedica reported sales, margins and profits that had been “artificially and illegally” inflated. (Complaint ¶26.) Lee sold shares of PolyMedica stock with knowledge of inside information unknown to the public. Lee sold stock during five significant time periods; i) 52,203 shares between January 21, 2000 and March 8, 2000; ii) 34,911 between June 5, 2000 and June 12, 2000; iii) 26,387 shares between September 14, 2000 and October 31,2000; and (iv) 150,000 shares on August 6, 2001.[24] The plaintiffs maintain that these sales were “not a part of any normal or regular pattern or practice” particularly due to the timing of the sales as they correlated to press releases and Lee’s public statements on behalf of PolyMedica.
Lee’s January through March 2000 sales occurred shortly after a January 18, 2000 press release reporting the artificially inflated “record results” for the fiscal period; the June 2000 sales were made just days after a press release whereby Lee reported that the “stock market had created a significant buying opportunity” in *122 PolyMedica’s stock; the September and October sales were made just weeks prior to the first Barron’s publication in November 2000 alleging fraud; and the 150,000 shares sold on August 6, 2001 occurred on the first trading day after another article published in Barron’s reported additional information on an FBI investigation into PolyMedica. The Barron’s article reported accounts of fraudulent shipping and billing practices from customers and employees including estimates that as much as “15% of [Liberty’s] business is fraudulent.” The article also noted that “employees have tried again and again to inform Lee, Trowbridge and others of improper activities [at Liberty]. These reports and criticisms . . . were sometimes met with silence or reprimand.” PolyMedica issued a press release on August 5, 2001 denying allegations of wrongful shipping and revenue recognition. The Complaint alleges that from January of 2000 to August 6, 2001 Lee sold 263,501 shares, or 97% of his total direct and indirect holdings. On August 8, 2001 Lee issued a press release acknowledging knowledge of a criminal investigation of PolyMedica.
Soltys
Soltys has been a director since 1996 and is also the sole owner of Boston Special Risks Insurance Agency, Inc., PolyMedica’s agent for corporate insurance. PolyMedica paid approximately $595,688 in premiums to Boston Special Risks in the fiscal year ended March 31, 2001 creating, the plaintiffs maintain, a debilitating conflict of interest. The Complaint alleges that Soltys illegally profited from trading on PolyMedica’s inside information by selling 21,926 shares of stock in four transactions on October 30, 2000 totaling $1,315,771. The stock sales were unusual in timing and/or amount because of the high quantity of sales and the proximity of the sales to the publication of the November 20, 2000 Barron’s, the first public allegation of fraud.
LoGerfo
LoGerfo has been a PolyMedica director since 1994. In 1995, “PolyMedica collaborated with LoGerfo and his employer Beth Israel Deaconess Medical Center to fund and conduct research on arterial grafts.” LoGerfo was a member of PolyMedica’s Audit Committee. LoGerfo illegally profited from trading on PolyMedica’s inside information when he sold 20,250 shares of PolyMedica common stock between August 8, 2000 and August 24, 2000 totaling $819,433. The stock sales were unusual in timing and/or amount because of the high quantity of sales and the proximity of the sales to the publication of the November 20, 2000 Barron’s, the first public allegation of fraud.
Bernstein
Berstein has been a PolyMedica director since 1992. Bernstein illegally profited from trading on PolyMedica’s inside information when he sold 42,800 shares of PolyMedica stock in five transactions on October 25, 2000 totaling $2,410,971. These sales were unusual in timing and/or amount because of the high quantity of sales and the proximity of the sales to the publication of the November 20, 2000 Barron’s, the first public allegation of fraud.
This court recognizes that the mere allegation that a director traded stock does not establish a breach of the duty of loyalty. McCall v. Scott, 239 F.3d 808, 824 (2001) (directors that own or receive compensation in stock should be expected to trade those securities in the normal course of events). However, a director “who trades for his own benefit on the basis of confidential information acquired through his fiduciary position breaches his duty to the corporation and may be held accountable to that corporation for any gains without regard to whether the corporation suffered damages.” McCall, 239 F.3d at 824, quoting Polin v. Conductron Corp., 552 F.2d 797, 811 (8th Cir. 1977). Therefore, to recover profits for a breach of the duty of loyalty, “it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.” McCall, 239 F.3d at 825, quoting Stevpak v. Ross, 1985 Del.Ch. Lexis 508, C.A. No. 7047 (Del. Ch. Sept. 5, 1985). “[Fraudulent] intent may be inferred from the timing and quantities of the trades.” Id., citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997).
In the present case, taking the allegations as true and drawing all inferences in a light most favorable to the plaintiffs, I find that the plaintiffs’ allegations are sufficiently well-pleaded to allege breach of fiduciary duty because of insider trading. Each defendant sold large amounts of stock at times proximately close to either significant but false public announcements by Lee or to the publication of adverse news reports.
These particularized allegations — that four of the six directors derived significant pecuniary benefit from the challenged transactions, namely the sale of stock while in possession of “inside information,” are sufficient under Massachusetts law to deem the majority of the board “interested” such that demand is excused. Unlike the plaintiff in Harhen, the plaintiffs here allege more than mere membership on the board during the alleged wrongdoing; they allege that the directors themselves were parties to the conduct and “had a material pecuniary interest” in the challenged transactions. Thus, under Massachusetts law, since the plaintiffs have alleged with particularity the reasons that they did not present demand on the board and have raised a reasonable doubt as to the directors’ disinterest at the time the complaint was filed, I find that demand was excused.
This decision is not inconsistent with Delaware law. Under Delaware law, where, as here, there is no specific challenge to a particular decision by a board of directors to act or refrain from acting, the applicable test for determining demand futility is
whether or not the particularized factual allegations of a derivative stockholder complaint create a rea *123 sonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.
Rales, 634 A.2d at 934 (this test for demand futility is applied where “the subject of the derivative suit is not a business decision of the board . . .”).
Where directors are sued, however, for wrongdoings not related to personal pecuniary gain a disabling interest is present when “the potential for liability is not a ‘mere threat’ but instead may rise to ‘substantial likelihood’ ” In re Baxter International, Inc. Shareholders Litg., 654 A.2d at 1270, quoting Rales, 634 A.2d at 936 (plaintiffs complaint alleged that defendant violated duty to exercise reasonable care in the oversight and supervision of company’s corporate affairs and management).
In Rales, the Court, in determining whether the board could have impartially considered a demand at the time the original complaint was filed, considered what the plaintiffs would have demanded if demand was made. At minimum a stockholder demand letter would “notify the directors of the nature of the alleged wrongdoing and the identities of the alleged wrongdoers." A board of directors, in responding to a demand, must first “determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand.” Rales, 634 A.2d at 935. Next, the ‘board must weigh the alternatives available to it, including the advisability of implementing internal corrective action and commencing legal proceedings.” Id., citing Weiss v. Temporary Inv. Fund, Inc., 692 F.2d 928, 941 (3d Cir. 1982). “In carrying out these tasks, the board must be able to act free of personal financial interest and improper extraneous influences.” Id.
The Rales court stated, similar to the Massachusetts standard, that “a director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.” Id. at 936. The court, however, elaborated on the interestedness standard and stated that “(d]irectorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.” The court reasoned in these situations involving corporate decisions, “a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.” Id.
The defendants contend that the demand futility standard requires the plaintiffs to demonstrate that because the directors have a substantial likelihood of personal liability, there is a reasonable doubt that a majority of the board is disinterested. This court disagrees. The test, under both Massachusetts and Delaware law, is that a director is interested when there are adequate allegations that the director received a personal financial benefit from a transaction. This test is consistent with the American Law Institute’s Principles of Corporate Governance adopted by the Supreme Judicial Court in Harhen v. Brown, 431 Mass. 838 (2000): a director is "interested” when the director has a “material pecuniary interest in the transaction” and that interest would “reasonably be expected to affect” the director’s judgment “in a manner adverse to the corporation.” The “substantial likelihood” or “significant prospect” standard, under both Delaware law and the Principles of Corporate Governance, applies only when a director approves or acquiesces in a business decision and does not have, among other things, a material pecuniary interest in a challenged transaction or conduct.
This court concludes that the four members could not have acted free of financial interest at the time demand would have been made and that a decision by the Board to bring suit against these directors “could have potentially significant financial consequences for those directors. Common sense dictates that, in light of these consequences ...” the four Board members, Lee, Soltys, LoGerfo and Bernstein have a “disqualifying financial interest that disables them from impartially considering a response to a demand” by the plaintiffs. Id.[25] Accordingly, demand was excused.
ORDER
For the foregoing reasons, Defendants’ Motion to Dismiss is DENIED.

Liberty's sale force worked off of a low base salary of approximately $16,640 per year with any remaining income attributable to commission. Liberty’s most successful sales personnel earned up to an additional $44,200 per year in commissions.

GAAP is the industry standard for financial reporting and requires that revenue be recognized only when it is earned and that returns and refunds owed be properly accounted for as such.

Defendants Hooper, Soltys, and LoGerfo.

Marcia J. Hooper.

Plaintiffs allege that seven of the eight defendants, including four members of PolyMedica’s six-member board, sold a total of more than 300,000 shares of PolyMedica common stock from their personal holdings for proceeds collectively exceeding $ 14 million.

Plaintiffs allege that these four defendants collectively received proceeds in excess of $9.4 million.

 The amount of shares allegedly sold were as follows: Lee: 95,600 shares; Siciliano: 71,700; Walters: 38,240; and Bernstein: 4,780. (Complaint ¶42.)

Plainttffs cite a December 31, 1999 press release whereby PolyMedica reported “record results of $42.4 million for its fiscal third quarter . . . record results for its fiscal third quarter . . . [tjhis is the twelfth quarter of profitable growth over comparable periods.” (Complaint ¶43.)

Plaintiffs assert that: Lee sold 52,203 shares in four transactions between January 21, 2000 and March 8, 2000 totaling $1,967,190; Walters sold 23,500 shares in three transactions between February 2, 2000 and March 8, 2000 totaling $988,620 (two transactions of which occurred on March 8, 2000); Siciliano sold 42, 907 shares between March *124 2, 2000 and March 9, 2000 totaling $2,023,687. The average stock price for the shares sold during this time period was $42.35 per share. (Complaint, ¶ 44)

The press release stated, “PolyMedica today reported record revenues of $47 million for its fiscal fourth quarter ended March 31,2000, a54% increase over revenues of $30.6 million for the same period in fiscal 1999. Recurring earnings per share (diluted) doubled to a record $0.44 from $0.22 in the year earlier period, when there were 3.7 million fewer average shares outstanding. This is the 13 th quarter of profitable growth over comparable periods.” (Complaint, ¶45.)

 Plaintiffs allege that Lee has never purchased PolyMedica common stock on the open market.

Lee sold 34,911 shares in three transactions between June5,2000 and June 12,2000 totaling $1,254,514; Walters sold 9,000 shares on June 8, 2000 totaling $335,970. The average sales price for the June sales by Lee and Walters was approximately $36.22 per share.

Siciliano sold 18,670 shares in two June 2000 transactions totaling $675,399; Walters sold 11,000 shares in three transactions, two of which occurred on September 12, 2000 and the third on October 31, 2000, totaling $523,520; Logerfo sold 20,250 shares between August 8, 2000 and August 24, 2000 totaling $819,433; Soltys sold 21, 926 shares in four transactions on October 30, 2000 totaling $1,315,771; Bernstein sold 42,800 shares in five transactions on October 25, 2000 totaling $2,410,971; and Lee sold 26,387 shares in five transactions four of which occurred on September 14, 2000 and the fifth on October 31, 2000, totaling $1,431,212. The average share price for the June 14, 2000 to October 31, 2000 sales was approximately $53.61. (Complaint, ¶53.)

The release stated, among other things, “Liberty only bills Medicare when it has received complete order information including signed Authorization of Benefits and Doctor’s Orders; and . . . Liberty contacts its customers and receives authorization prior to shipment and documents this communication according to Medicare guidelines.”

Plaintiffs assert this increase was mainly due to Lee’s express denials of improprieties.

PolyMedica responded by noting that the number of situation reports was small based on the volume of monthly orders.

Mass. Rule 23.1, with some minor changes, is the same as Federal Rule 23.1 and provides in part, that the complaint in a stockholders’ derivative action should allege with particularity the efforts, if any, made by the plaintiffis) to obtain the desired action from the directors or comparable authority, and the reasons for the failure to obtain the action or for not making the effort.

If the plaintiff presents a demand to the board and the demand is refused, the plaintiff is required to present a demand to all remaining shareholders except where demand would be futile because the remaining shareholders are interested or because the number of other shareholders is so large that demand becomes a “pointless or . . . impossibly burdensome act.” Harhen at 868, quoting Levitt v. Johnson, 334 F.2d 815, 818 (1st Cir. 1964), cert. denied, 379 U.S. 961 (1965).

The Principles of Corporate Governance define the term “interested” as follows:
a) A director... or officer... is ‘interested’ in a transaction or conduct if either:
(1) The director or officer, or an associate of the director or officer, is a party to the transaction or conduct;
(2) The director of officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director’s or officer’s judgment with respect to the transaction or conduct in a manner adverse to the corporation;
(3) The director or officer, an associate of the director or officer, or a person with Whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors’ fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director’s or officer’s Judgment in a manner adverse to the corporation; or
(4) The director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director’s or officer’s judgment with respect to the transaction or conduct in a manner adverse to the corporation . . .
(c) A director is interested in an action ... if
(1) A director is interested, within the meaning of Subsection (a), in the transaction or conduct that is the subject of the action, or (2) The director is a defendant in the action, except that the fact a director is named as a defendant does not make the director interested under this section if the complaint against the director:
(A) is based only on the fact that the director approved or acquiesced in the transaction or conduct that is the subject of the action, and
(B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders.
ALI Principles of Corporate Governance: Analysis and Recommendations §§1.15 and 1.23 (1994).

While the substantive law of Massachusetts is controlling, this court recognizes that the Supreme Judicial Court in Harhen has looked to the Delaware Supreme Court for derivative actions.

In “demand refused” cases, the board is given the benefit of the presumption that it is disinterested and afforded the protections of the business judgment rule. Harhen, 431 Mass. at 844. In order to overcome the presumption of disinterest in a demand refused case, the plaintiff must allege facts that challenge the “board’s good faith or the reasonableness of the board’s investigation of the plaintiffs demand." Id.

The Appeals Court, however, was troubled that the plaintiffs amended complaint failed to allege “with particularity why demand was not made” on the board of trustees. The Court emphasized its reluctance to draw inferences from the record “given the clear requirements of Rule 23.1.” Cote, 52 Mass.App.Ct. n. 11.

The verified complaint additionally reflects sales by Walters and Siciliano, the respective Chief Financial Officer and President of PolyMedica, which do not affect the demand futility analysis under Rule 23.1 because they are not directors.

The defendants urge that some of Mr. Lee’s sales were not ordinary but rather an “equity swap” and/or the exercise of a “put." At this stage, this court will confine itself to the allegations as set forth in the Complaint.

Thepossible application of certain exculpatory provision of PolyMedica’s Articles of Incorporation — essentially an affirmative defense — is not an issue that is appropriately addressed at this early stage.