**Norman SALSITZ, Plaintiff,**

v.

**Jacques A. NASSER, et al., Defendant.**

No. 00–CV–74181–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 31, 2002.

**590**

Elwood S. Simon, John P. Zuccarini, Elwood S. Simon Assoc., Birmingham, MI, for plaintiff.

Seth D. Gould, Feeney, Kellett, Bloomfield Hills, MI, for defendant.

## ORDER GRANTING "MOTION TO DISMISS THE AMENDED COMPLAINT"

CLELAND, District Judge.

This matter arises from Plaintiff Norman Salsitz's Amended Verified Complaint, filed on February 24, 2002, asserting a shareholder derivative action on behalf of Ford Motor Company ("Ford" or "the Company"). The amended complaint names certain current and former directors and officers of Ford as defendants.[1] It is Plaintiff's allegation that the individual defendants (hereafter "Defendants") recklessly or intentionally breached their fiduciary duty of care to the Company with regard to three decisions made and implemented over the last 20 years: (1) the decision from approximately 1982 to 1995 to mount a computerized ignition system, known as a thick film ignition ("TFI") switch, directly onto the engine block, despite the switch's propensity to fail and shut down the engine if overheated; (2) the decision ongoing from 1990 to 2000 to install Bridgestone/Firestone tires on Explorer vehicles, even though the tires made the Explorer prone to instability and rollovers; and (3) the prolonged failure to oversee and monitor the purchase of palladium, a precious metal used in certain Ford vehicles, which resulted in a costly write-down for excessive purchases.

Now pending before the court is Defendants' motion pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The essence of Defendants' motion is that Plaintiff has failed to make a proper "demand" upon Ford's board of directors as required under Federal Rule of Civil Procedure 23.1.

### I. STANDARDS

■ Rule 23.1 provides that a shareholder of a corporation may bring a legal action on

---

1. Specifically, the complaint names the following individuals as defendants: Jacques A. Nasser, Michael D. Dingman, Edsel B. Ford II, William Clay Ford, William Clay Ford Jr., Irvine O. Hoc- kaday Jr., Marie–Josee Kravis, Ellen R. Marram, Homer A. Neal, Jorma J. Ollila, Carl E. Reichardt, Robert E. Rubin, and John L. Thornton.

behalf of that corporation if, among other things, the plaintiff (1) was a shareholder at the time of the transaction complained of and (2) has first sought to obtain the action desired from the directors of the corporation. Fed.R.Civ.P. 23.1. This second requirement that the plaintiff make a "demand" upon the corporation's board of directors may be excused as provided under the substantive law of the state of incorporation. *McCall v. Scott*, 239 F.3d 808, *amended in part by* 250 F.3d 997 (6th Cir.2001)[2] (citing *Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 108–09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)). Insofar as Ford is incorporated in the state of Delaware, Delaware law must control the court's resolution of the instant motion.

"A basic premise of corporate governance under Delaware law is that the directors, rather than the shareholders, manage the business and affairs of the corporation." *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001) (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984)). Shareholders, thus, are permitted to challenge the propriety of decisions made by directors under their authority, only by overcoming "the powerful presumptions of the business judgment rule." *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927 (Del.1993)). The specific requirements for overcoming these presumptions vary somewhat depending upon the precise nature of the challenged action.

■ Where a conscious decision by directors to act or refrain from acting is made, demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) [a majority of] the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* (quoting *Aronson*, 473 A.2d at 814). Under the first prong, independence requires that a director's decision be based on the corporate merits of the subject before the board rather than extraneous considerations or influences. *Id.* at 256 n. 31. This standard is satisfied if a majority of the

board that was in office at the time of filing was free from personal interest or domination and control, and thus capable of objectively evaluating a demand and, if necessary, remedying the alleged injury. *Brehm v. Eisner*, 746 A.2d 244, 257 (Del.2000). "It is no answer to say that demand is necessarily futile because (a) the directors 'would have to sue themselves, thereby placing the conduct of the litigation in hostile hands,' or (b) that they approved the underlying transaction." *Id.* at 257 n. 34. Under the second prong, the business judgment rule provides that "whether a judge or jury considering [a business decision] after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational,' provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." *In re Caremark Internat'l Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del.Ch.1996). Thus, a court may not consider "the content of the board decision that leads to corporate loss, apart from consideration of the good faith or rationality of the process employed." *Id.*

■ Where, on the other hand, there is no conscious decision to act or refrain from acting, demand is excused when the particularized facts "create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand." *McCall*, 239 F.3d at 816 (quoting *Rales*, 634 A.2d at 934). Under this standard, corporate boards cannot be charged with wrongdoing "simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *Caremark*, 698 A.2d at 969. Rather, the rule recognizes the balance between two potentially conflicting principles of corporate governance. On one side is the principle that "[m]ost of the decisions that a corporation, acting through its human agents, makes are ... not the subject of director attention.

---

**2.** The amended opinion simply clarifies portions of Part II.C from the original opinion. This memorandum thus will refer to the ruling collectively as the *McCall* case, but will cite to the latter opinion for analysis arising from Part II.C.

Legally, the board itself will be required only to authorize the most significant corporate acts or transactions: mergers, changes in capital structure, ... etc." *Id.* at 968. Nonetheless, it must also be acknowledged that "ordinary business decisions that are made by officers and employees deeper in the interior of the organization can ... vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals." *Id.* Thus, "when director liability is predicated upon ignorance of liability-creating activities, 'only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information reporting system exists—will establish the lack of good faith that is a necessary condition to liability.'" *McCall,* 250 F.3d at 999 (quoting *Caremark,* 698 A.2d at 971). As long as a reasonable information system exists, "the level of detail that is appropriate ... is a question of business judgment." *Caremark,* 698 A.2d at 970.

Generally, directors of a company are measured against the foregoing duties of care by the "gross negligence" standard. *McCall,* 250 F.3d at 999. Defendants, however, claim that, under the waiver-of-liability provision contained in Ford's corporate charter, they are protected even against gross negligence claims. The relevant charter provision provides as follows:

A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability

(i) for any breach of the director's duty of loyalty to the corporation or its stockholders,

(ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law,

(iii) under Section 174 of the Delaware General Corporation Law or

(iv) for any transaction from which the director derived an improper personal benefit.

(Certificate of Ford Motor Company, Art. 8, § 5.1, attached to Defs.' Reply as Ex. A.)[3]

Such provisions are authorized pursuant to 8 Del.Code Ann. § 102(b)(7). The Sixth Circuit, applying Delaware law, has expressly held that "[w]hen the validity of such a provision is not contested and the factual basis for the claims implicates only a breach of the duty of care, the waiver may properly be considered and applied in deciding a motion to dismiss for failure to make a pre-suit demand." *McCall,* 250 F.3d at 1000. These prerequisites are satisfied in this case. Thus demand futility will be demonstrated only if Plaintiff has alleged "acts or omissions [1] not in good faith or [2] which involve intentional misconduct or [3] a knowing violation of law." (Certificate of Ford Motor Company, Art. 8, § 5.1.) Under Delaware law, the duty of good faith is violated where a director "consciously disregards" his duties to the corporation. *Id.* at 1000–01. Mere "sustained inattention" is insufficient. *Id.*

In setting forth facts sufficient to meet the foregoing standard, a plaintiff must "comply with stringent requirements of factual particularity" under Federal Rule 23.1 and its Delaware counterpart, Chancery Rule 23.1. *McCall,* 239 F.3d at 815 (quoting *Brehm,* 746 A.2d at 254). These rules are not satisfied by conclusory statements, opinions, or speculation. *Brehm,* 746 A.2d at 254–55. Rather, "what a pleader must set forth are particularized factual statements that are essential to the claim." *Id.*

The Sixth Circuit has noted—as is evinced by the foregoing standards of law—that "director liability for breach of the duty to exercise appropriate attention to potentially illegal corporate activities [is] ... 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *McCall,* 239 F.3d at 817 (quoting *Caremark,* 698 A.2d at 967). In this case, Plaintiff has failed to set forth facts that are sufficiently specific to overcome this high hurdle. Accordingly, the court will dismiss the complaint in its entirety.

## II. DISCUSSION

In ruling on a motion under Rule 12(b)(6), the relevant facts are those set forth in the

---

**3.** This provision has been a part of Ford's certifi- cate since at least 1987.

complaint, which the court must accept as true. *Jackson v. Richards Medical Co.,* 961 F.2d 575, 577 (6th Cir.1992). Accordingly, the court will discuss each of the wrongs purportedly committed by Defendants in the context of the allegations set forth in Plaintiff's first amended complaint.

## A. TFI Module

The TFI module is a computerized ignition system that was installed by Ford in a number of vehicle models directly onto the engine block. It is alleged that the TFI has a propensity to fail and thereby shut down the engine if overheated. Facts that are non-conclusory and otherwise satisfy the pleading requirement of Rule 23.1 have been culled from the complaint and are set forth below as follows.

### 1. Allegations

(1) Engineers began to raise warnings about TFI module overheating and malfunctioning as early as 1982. (Compl.¶ 46)

(2) Ford continued to mount the TFI on the block engine from 1983 through 1995. Internal Ford documentation reveals a "heated dispute among Ford engineers and officials throughout this period regarding both the existence of the problem and the most effective and cost efficient means of curing it." (*Id.* ¶ 33.)

(3) In May 1982, Ford engineers compiled a list of components that could cause a "quits on road" condition—a failure that causes the vehicle to shut down while being driven. While the document questioned whether a recall was necessary, the Company took no corrective action; it also continued to tell NHTSA there was no "common pattern or cause" behind the complaints about stalling. (*Id.* ¶ 47.)

(4) A warranty analysis conducted in January 1984 demonstrated that the TFI—which was supposed to last for the lifetime of the vehicle—would fail at a rate of 56% at five years or 50,000 miles. (*Id.* ¶ 46)

(5) Ford's Policy and Strategy Committee, which included some of the Defendants, repeatedly discussed the risks and problems inherent in the TFI mechanism. (Compl.¶ 51)

(6) On March 12, 1985 the committee discussed problems with the TFI module and concluded in an internal document that "'stall' rates on 1985 model Tempos—Topazes were unchanged from the year earlier." (*Id.* ¶ 52.) The committee claimed that stalling problem was not a safety issue. The committee would have been required to report safety issues to NHTSA. (*Id.* ¶ 53.)

(7) NHTSA has recently obtained information regarding the TFI and has found that Ford improperly withheld this information, because it was, in fact, safety related. (*Id.* ¶ 54.)

(8) In July 1985, Ford's Board of Directors was notified that a company task force was studying why the TFI module and another part failed in "hot climates" within warranty and more temperate climates after warranty. Documents setting forth these facts and delivered to the Company's then-sitting board reflect the first presently-available and known evidence of Defendant's continuing wrongful course of conduct. (*Id.* ¶¶ 49–50.)

(9) At a meeting on October 9, 1986, the Board discussed the TFI issue. A preliminary report indicated that the associated warranty costs for 1986 would be approximately $150 million. (*Id.* ¶ 55.) This estimate was subsequently increased to $200 million. (*Id.* ¶ 56.) Another report delivered to Ford's president on or about November 5, 1986, indicated that the total cost of correcting the TFI problems would have cost Ford approximately only $200 million more than the expected cost for one year of warranty related repairs. (*Id.* ¶ 57.) Ford was also aware that about 10% of TFI modules would have stalling problems in 1986. (*Id.*)

(10) In October 1986, federal safety officials closed an ongoing investigation into TFI modules. The investigation was closed, at last in part, based on Ford's assurances that it knew of no recognizable source or cause of the problem. While Ford was telling federal safety officials that it had no idea what the cause of the problem could be, the Board was simultaneously discussing projected costs to fix the module. (*Id.* ¶ 58.) Minutes from the Board meeting were not handed over to investigators. (*Id.* ¶ 34.)

(11) A November 1986 survey of Ford customers who reported problems with their cars stalling revealed that 66% had to have their cars towed due to TFI failure and 29% had experienced a TFI-related failure that caused the engine to quit while their car was in motion. (*Id.* ¶ 59.)

(12) On November 13, 1986, Ford's President gave the Board a status report on the ongoing TFI problem. The Board at this time concluded that a recall was "not feasible" because the Company did not have sufficient replacement parts (*Id.* ¶ 61.)

(13) In December 1986, the Board received a committee report recommending to undertake an owner notification program to replace TFI modules for only 1.2 million cars manufactured in 1984 and 1985, which was a small percentage of the affected vehicles. (*Id.* ¶ 62)

(14) In a July 1988 memorandum, officials in Ford's electrical division expressed concern to the Board, stating that "we understand the cost pressures ... [h]owever, [the Board's] posture is not consistent with company quality goals." (*Id.* ¶ 63.)

(15) The TFI issue was discussed at Board meetings held in December 1987, January 1989, and October 1991. At the October 1991 meeting, the Board was shown a new diagnostic machine which had been designed and created to assist, among other things, in the diagnosis of electronic problems, including the TFI module problem. (*Id.* ¶ 64.)

(16) In 1995, Ford finally stopped attaching the TFI module to the distributor.

(17) Sometime in 2000, the *New York Times* published an article alleging that top company executives repeatedly assured regulators that there was no way of determining what might be causing the "stalling" problem with certain Ford vehicles. Internal documentation, however, shows that company engineers and safety officials knew the cause of problem was the TFI, but failed to hand pertinent information over to investigators. (Compl. ¶¶ 30, 34.)

(18) Ford settled four lawsuits involving serious injuries and deaths arising out of the TFI defect. (*Id.* ¶ 35.)

(19) A study prepared for the plaintiff in one such case found that drivers of vehicles with the TFI module faced a 9% greater chance of being in a fatal crash than drivers of vehicles without the module. (*Id.* ¶ 35.)

(20) The *Times* article cited Alan Kam, a retired NHTSA official, as stating that Ford actively "concealed signs of failures that were occurring at an astronomical level, at a figure far beyond any measure I have seen before." (*Id.* ¶ 36.)

(21) The *Times* article further alleged that the decision was made not to move TFI from the engine block in future models "for cost/function reasons." (*Id.* ¶ 45.)

(22) On August 30, 2000, Judge Ballachey, a California state judge presiding over litigation arising out of the TFI defect accused Ford of engaging in an enormous cover-up by concealing the TFI design defect from regulators and consumers. (*Id.* ¶¶ 4, 37.) That case was settled in 2001. (*Id.*) Settlement was reported as having the potential of costing Ford as much as $2.7 billion. (*Id.* ¶ 38.)

(23) Judge Ballachey also blamed Ford for a corporate culture in which executives understood that their careers would be ruined if they reported design defects. The judge stated that the testimony of a top Ford engineer's reluctance to convey bad news about the ignition module reminded him of "The Emperor's New Clothes." (*Id.* ¶ 44.)

(24) Other actions regarding the TFI module are pending in five other states. (*Id.* ¶ 39.)

(25) Ultimately, federal investigators opened and closed five investigations into the TFI module. Throughout these investigations, the Company claimed it knew of no particular defect that would cause the engine shut-down problem and failed to provide regulators with critical internal documents regarding the issue. (*Id.* ¶ 32.)

**2. Analysis**

■ Plaintiff's challenge with regard to the TFI module is not a challenge of the board's "unconsidered inaction," but rather a challenge of the board's deliberate decision not to take remedial action. No claim has

been made that the individual Defendants were not disinterested or independent. Accordingly, the TFI claims may proceed only if the complaint creates a reasonable doubt regarding whether the TFI decisions were the product of a valid exercise of business judgment. Even if the decisions were not the product of a valid exercise of business judgment, Defendants can be liable only if the complaint sufficiently alleges bad faith, illegal conduct, or a conscious disregard of known risks. Mere gross negligence is insufficient.

Plaintiff's disagreement with Ford's decision not to relocate the TFI module from the engine block is insufficient to permit this claim to proceed. Under the business judgment rule, the merits of the decision may not be reviewed by the court. Rather, the TFI claim may proceed only if the decision was not made rationally or in a good faith effort to promote the Company's best interest. There is no indication in the complaint that the decision to continuing mounting the TFI module on the engine block was not the product of a valid exercise of business judgment. Indeed, the complaint acknowledges that a "heated dispute" took place within the company, that the Board was well apprised of the ongoing debate, and that the Board periodically was informed regarding efforts to identify more precisely and correct the problem. Furthermore, Plaintiff has failed to state with specificity when the Board was, or should have been, certain that the TFI module's placement on the engine block was the actual cause of the stalling problem that was known to occur.

The only allegations of "bad faith" or "illegal conduct" asserted are that certain documents were withheld from NHTSA in its investigation into the stalling problems. Nonetheless, the complaint does not allege that the Board itself was responsible for, or even aware of, this failure. Presumably the responsibility for delivering appropriate documents to NHTSA belonged to management and not to the board itself. Although the 2000 *Times* article reported that relevant documentation had been withheld by Ford from NHTSA, it did not implicate any members of the board, and indeed, represents the only alleged source from which the Board could have been aware of the problem. Finally, there is no indication that NHTSA ever took corrective action against Ford. Because the complaint does not specifically allege any improper conduct by Defendants themselves, the claim that they personally should be liable for damages arising from the TFI module's placement on the engine block must be dismissed.

Plaintiff further claims that Ford's settlement of four wrongful death actions that allegedly were caused by the TFI module is a further indicator of the Company's bad faith. The court rejects this argument as unfounded. The decision to settle claims purported to have arising out of the TFI defect alone does not indicate bad faith; nor is there any indication that the settlements were not the result of a valid business judgment.

Finally, Defendants assert that a majority of the Company's current board members were not on the Board at the time decisions pertinent to the TFI module were made. Plaintiff has failed to plead facts sufficient to demonstrate otherwise. Thus, Plaintiff cannot argue that demand on the current board would have been futile. Thus, for all the foregoing reasons, the court concludes that Plaintiff's allegations are insufficient to excuse demand as to the TFI module claim.

### B. Bridgestone/Firestone Tires

The following well-pleaded allegations are set forth in the complaint with regard to the Board's reaction to the Bridgestone/Firestone tire problems.

#### 1. Allegations

(1) In 1990, the Ford Explorer was introduced to replace the Bronco II, which had attracted unfavorable publicity after the vehicle was widely linked to rollovers. The reported problems with Bronco II should have alerted Ford to take extra precautions with the Explorer. (Compl.¶¶ 67–68.)

(2) Ford intentionally designed the Explorer with a high center of gravity to take advantage of the Bronco II's rugged SUV image. A 1990 internal Ford memorandum observed that "[t]he relative high engine position of the Explorer, unchanged from the

Bronco II, prevents further significant improvement in stability." (*Id.* ¶ 68.)

(3) Ford's own safety tests on Explorer showed that the two-door model performed no more safely than the Bronco II and that the four-door performed only slightly more safely. (*Id.* ¶ 69.)

(4) Ford did not undertake any redesign of the Explorer's suspension until 1995. (*Id.*)

(5) At least two tire manufacturers, Michelin and Firestone, competed to supply tires for the new Explorer. Michelin has at all times held a world-wide reputation for high safety standards; Firestone, on the other hand, has had a long history of quality and manufacturing problems, including tread separation problems that in 1978 resulted in a forced recall of 13 million Firestone "500" tires. As a result of the 1978 tire problems, which were linked to 41 deaths, Firestone faced more than 250 personal injury lawsuits, a host of class action suits, and a virtual rebellion by customers. Firestone was crippled financially by the 1978 recall and only managed to limp through the 1980's until 1988, when it was acquired by Bridgestone, a Japanese corporation. (*Id.* ¶¶ 70–71.)

(6) Firestone was founded by the great-grandfather of Defendant William Clay Ford, Jr., and the Ford Company has maintained a close relationship with Firestone since 1906. In 1990 Ford chose Firestone to supply the tires for its new Explorer. (*Id.* ¶ 72.)

(7) Ford's Board deferred all tire safety oversight and monitoring to Firestone. Ford kept no safety records on the Firestone tires installed on Explorers. (*Id.* ¶ 73.)

(8) In part to compensate for the SUV's high center of gravity, Ford recommended that Explorer owners under-inflate their tires to ensure a smooth ride. Ford was aware that under-inflation would result in excessive pressure on the tire belts and also contribute to heat building up in tires, both factors that could increase the occurrence of tread separation. (*Id.* ¶ 74.)

(9) *The Wall Street Journal* studied data and information available to Ford and concluded that equipping the Explorer with Firestone tires made for a potentially deadly combination. NHTSA data indicated that a disproportionate number of problems with Firestone tires were also connected to the Explorer. (*Id.* ¶ 75.)

(10) As early as 1992, motorists in Saudi Arabia and Venezuela complained that they were experiencing blowouts while driving Ford vehicles equipped with Firestone tires. (*Id.* ¶ 77.)

(11) In a widely reported accident on September 5, 1996, TV reporter Stephen Gauvain was thrown from his Explorer and killed when the tread suddenly separated from one of his original-issue Firestone tires. (*Id.* ¶ 77.)

(12) In July 1998, a State Farm Insurance researcher advised NHTSA that he had studied 21 cases of earlier tread separation in the Firestone tires and outlined a pattern of flaws for the agency. (*Id.* ¶ 78.)

(13) In October 1998, Ford itself noted problems of tread separation on Firestone tires mounted on the Explorer and other light truck models in Venezuela and sent examples of the failed tires to Firestone for analysis. (*Id.* ¶ 79.)

(14) It was not until August 1999, that Ford quietly began replacing Firestone tires with tread separation problems on Explorers previously sold in Saudi Arabia. Ford, however, did not publicly disclose its safety concerns with the tires, and instead concealed the true purpose behind the offer to replace tires, terming it a "customer notification enhancement action." Ford also failed to inform NHTSA of its actions in Saudi Arabia. This failure to report was in response to, *inter alia,* the specific request of Firestone, which was concerned that reporting the Saudi recall would prompt costly regulatory scrutiny in the United States. (*Id.* ¶ 80.)

(15) A *Chicago Sun–Times* article published on or about August 1, 2000, reported that Ford had begun replacing tires on Explorer models in South American countries where "tires have ripped apart beneath vehicles, causing crashes and rollovers.... The same brand of tires on Explorers in the United States has been blamed for more than 30 deaths and 75 accidents and prompted a federal inspection." The article quoted an indi-

vidual from a consumer group in Washington, D.C., as stating that Ford's failure to act was "criminal." Similar allegations of possible criminal culpability by Ford or Firestone or their officials were leveled by Senator Arlen Specter during congressional hearings on September 6, 2000. (*Id.* ¶ 82.)

(16) More than a year before initiating any public education and/or recall procedures in the United States, Ford had come under fire for beginning a Firestone tire recall in 16 foreign countries, including several in the Persian Gulf. (*Id.* ¶ 83.)

(17) On August 9, 2000, Firestone announced a region by region recall of more than 6.5 million tires, the majority of which had been installed by Ford on its Explorer and other light truck models. (*Id.* ¶ 84.)

(18) The August 2000 recall came after several large retailers, including Sears Roebuck and Co., Montgomery Ward, and Discount Tires, publicly refused to continue selling the Firestone tires and following NHTSA's receipt of approximately 270 complaints about the tires and reports of over 40 deaths and 80 injuries. (*Id.* ¶ 85.)

(19) Ford mismanaged its part in the recall. (*Id.* ¶ 86.)

(20) In May 2001, Ford announced its plan to pay for the replacement of an additional 13 million Firestone tires. The cost of this replacement program to Ford was estimated at $3 billion. (*Id.* ¶ 87.)

(21) As a result of the tire/roll-over debacle, Ford has been named in a number of class action lawsuits. (*Id.* ¶ 88.)

(22) Ford has further damaged its image by denying culpability and blaming the rollovers on Firestone, road surface conditions, or the manner in which the cars were driven. (*Id.* ¶ 89.)

(23) Ford has acknowledged some mismanagement in its relationship with Firestone and its tracking of the tire issue. (*Id.* ¶ 89–91.)

(24) Ford's Vice President for Environmental and safety Engineering has said that Ford saw no need to alert government officials to Ford's program over the past year to replace failed Firestone tires in 16 overseas markets, because Ford claimed that the replacement were needed to address unique road and weather conditions in those countries. (*Id.* ¶ 92.)

(25) Defendant Jacques Nasser admitted in a deposition taken on August 22, 2001 that "Ford knew as early as ... May of 1999 that [Ford was] having deaths, having tire separations and rollovers that followed from Ford Explorers that had the same kind of Firestone tires on them that were sold in the United States...." (*Id.* ¶ 93.)

### 2. Analysis

█ As with the TFI module, the facts alleged with regard to the tire debacle do not allege "unconsidered inaction," but rather specific decisions to act or not act in certain ways. With regard to the allegedly improper decisions regarding the Explorer's design, such decisions are protected under the business judgment rule, as there are no facts to indicate that they were made irrationally or in bad faith. Similarly, the Board's alleged decision not to track the safety record of Firestone tires is not a sufficient ground on which to hold the Defendants liable in their personal capacities. The complaint does not allege that this decision was made in bad faith—for example, with the intent to later be able to profess ignorance of serious defects. While perhaps susceptible to being characterized as "unwise" or "negligent," the decision does not rise to the level of gross negligence, let alone to the requisite conscious disregard standard.

The only allegation by Plaintiff that even arguably could permit the tire claim to go forward is the general claim that, once Ford became aware of the tire problem, it failed to act in remedying the problem and informing the appropriate authorities. The specifics of the complaint, however, contradict Plaintiff's general assertion.

First, the complaint states that an unspecified number of motorists in Saudi Arabia and Venezuela reported tire problems to Ford in 1992. One death in the United States caused by a tire defect was widely reported in 1996. Although one might presume that the Board generally was aware of these incidences, there was no indication that they were any-

thing other isolated incidents, occurring in a singular locale or on a chance occasion. Indeed, the complaint asserts that it was not until 1998 that the Company, not the Board, first noted a specific problem with tread separation. Even then the problem was known only in some climates. And, according to the complaint, Ford reacted to the problem by sending samples of failed tires to Bridgestone for analysis.

In 1999 and 2000 Ford began offering tire replacement programs in the locations where problems had been documented. Although Plaintiff asserts that the "replacement" program was an effort to avoid the legal consequences in the United States of reporting what was actually a "recall," there is no allegation that the Board was aware of any such problems. Nor is there any allegation that NHTSA or any other regulatory body issued warnings, found violations, or otherwise castigated Ford for its behavior. Thus, it simply is not clear from the complaint when the Board became aware that the actual problem was the tires themselves, and not—as the Company publicly had announced—a problem specific to certain climates.

Furthermore, there is no indication that the Board failed to act after being made fully aware of the problem. As previously stated, the problem initially was referred by the Company to Bridgestone for analysis. In 1999 and 2000, replacement programs in pertinent countries followed the Company's asserted belief that unique conditions in those countries made replacement advisable. Finally, in May 2001 Ford engaged in a full replacement/recall program. In short, Plaintiff's claim amounts to no more than a disagreement, with the benefit of hindsight, concerning the timing and scope of remedial actions taken by Ford in response to the tire problems. Without evidence of bad faith on part of the individual defendants, of which none has been presented, the Company's actions fall well within the parameters of the business judgment rule.

Plaintiff focuses extensively on the Sixth Circuit's decision in *McCall v. Scott*, 239 F.3d 808, *amended in part by* 250 F.3d 997 (6th Cir.2001), and the Seventh Circuit's decision in *In Re Abbott Laboratories Derivative Shareholders Litigation*, 293 F.3d 378 (7th Cir.2002). Both cases, however, are distinguishable based on the specific allegations of wrongdoing set forth in those cases.

First, in *McCall*, the court addressed claims of "wide-spread and systematic health care fraud by Columbia's hospitals, home health agencies, and other facilities." *McCall*, 239 F.3d at 813. The complaint cited significant factors demonstrating that the board must have been aware of the fraud, including (1) audit discrepancies between cost reports submitted to the government and secret reserve reports; (2) improper acquisition practices in which at least one of the directors personally was involved; (3) a *qui tam* action alleging a widespread strategy to engage in violations of federal law; and (4) an extensive criminal investigation that included raids on thirty-five Columbia facilities in six different states. *Id.* at 820–24. Finally, the court stated that "a significant factor in our assessment of the factual allegations was the prior experience of a number of the defendants as directors or managers of health care organizations that were acquired by Columbia." *Id.* at 819. Given the *McCall* defendants' prior experience, the court was persuaded that the failure to react to the criminal investigation and other "red flags" created a strong inference of intentional or reckless disregard.

*Abbott* similarly involved clear violations of federal law. In that case, Abbott laboratories had been investigated by the FDA for failure to comply with federal regulations in a variety of ways. During a six-year period, the FDA conducted thirteen separate inspections of Abbot's facilities. *Id.* at 382. Four formal certified Warning Letters were sent to Abbot, cautioning that failure to correct certain deviations could result in severe regulatory action. *Id.* Some of these notices had been sent directly to the chairman of the board. *Id.* at 388. Moreover, the court noted that the directors had a duty under the SEC to comply with "comprehensive government regulations" and that information concerning the violations had been made known to the general public early in the six-year period. *Id.* at 388. Despite these factors, no

action was ever taken by the defendants, and Abbot ultimately was given "the largest penalty every imposed for a civil violation of FDA regulations." *Id.* at 384.

That facts in this case are not analogous to those in *McCall* or *Abbott.* There are no allegations of criminal or civil investigations that plainly put the Board on notice of illegal behavior. Indeed, there is no indication in the complaint that Ford has ever been officially warned or sanctioned by NHTSA for any of its conduct in reaction to the tire debacle. Accordingly, the court concludes that insufficient facts have been set forth to indicate that Defendants ought to be personally liable for the resulting damages.

### C. Palladium

 Finally, as with the TFI module and Firestone tire issues, the court concludes that the complaint fails to state specific facts sufficient to warrant personal liability on part of Defendants.

#### 1. Allegations

(1) On January 2002, Ford disclosed that it was required to take a $1 billion write-off on the value of its stockpile of precious metals, primarily palladium. (Compl.¶ 95.)

(2) Ford uses palladium and other precious metals in its exhaust systems to make emissions cleaner. Over time, Ford has accumulated an unusually large hoard (compared to other manufacturers) of such precious metals, purportedly in anticipation of an expected growing need and to buffer the Company from potential unpredictable fluctuations in supplies from Russia. (*Id.* ¶ 96.)

(3) Ford left the job of acquiring palladium to the same purchasing-department employees who normally buy its steel and copper. These purchasing department personnel failed to coordinate with Ford's treasury department personnel and thus did not take the sort of basic precautions a reasonably sophisticated buyer routinely would use to hedge the inherent financial risk involved in high dollar purchases in clearly recognized potentially volatile markets. Likewise the purchasing department failed to stay in reasonable contact with Ford's engineering department, and thus

was unaware of Ford's own engineering innovations which were continuing to shrink the Company's need for the metal at the same time that the Company was increasing its purchases. (*Id.* ¶ 97.)

(4) Consequently, not only does Ford now find itself holding a huge over-supply of palladium, but, because the prices of the metal have recently fallen drastically and Ford failed to ensure its positions in the metal were properly hedged, the Company must now take the $1 billion dollar write-off. (*Id.* ¶ 98.)

(5) Defendants refused and/or failed to ensure the creation and implementation of even the most basic oversight and compliance monitoring procedures at the company. (*Id.* ¶ 99.)

#### 2. Analysis

This claim must be dismissed. There is no allegation in the complaint that the Board discussed, or even knew of, the palladium problem. Thus, the court must apply the "unconsidered inaction" standard. Under this standard, Defendants can be liable only if Plaintiff is able to "create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand." *McCall,* 239 F.3d at 816 (quoting *Rales,* 634 A.2d at 934). Plaintiff has failed to meet this standard, making only the conclusory allegation that "Defendants refused and/or failed to ensure the creation and implementation of even the most basic oversight and compliance monitoring procedures at the company." (Compl.¶ 99.) This conclusory allegation is not sufficiently specific to warrant holding Defendant's personally liable for the Company's palladium induced woes. Rather, to proceed on such a claim, Plaintiff would have to allege specific facts demonstrating "a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information reporting system exists." *McCall,* 250 F.3d at 999 (quoting *Caremark,* 698 A.2d at 971). No such specific facts are alleged.

## III. CONCLUSION

For all the foregoing reasons, IT IS ORDERED that Defendants' "Motion to Dismiss the Amended Complaint" is GRANTED.